## BROADRICK ET AL. *v.* OKLAHOMA ET AL.

No. 71–1639.   Argued March 26, 1973—Decided June 25, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 618. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post*, p. 621.

*John C. Buckingham* argued the cause for appellants. With him on the briefs was *Terry Shipley*.

*Mike D. Martin*, Assistant Attorney General of Oklahoma, argued the cause for appellees. With him on the brief were *Larry Derryberry*, Attorney General, and *Paul C. Duncan*, Assistant Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 818 of Oklahoma's Merit System of Personnel Administration Act, Okla. Stat. Ann., Tit. 74, § 801 *et seq.*, restricts the political activities of the State's classified civil servants in much the same manner that the Hatch Act proscribes partisan political activities of federal employees. Three employees of the Oklahoma Corporation Commission who are subject to the proscriptions of § 818 seek to have two of its paragraphs declared unconstitutional on their face and enjoined because of asserted vagueness and overbreadth. After a hearing, the District Court upheld the provisions and denied relief. 338 F. Supp. 711. We noted probable jurisdiction of the appeal, 409 U. S. 1058, so that appellants' claims could be considered together with those of their federal counterparts in *CSC* v. *Letter Carriers, ante*, p. 548. We affirm the judgment of the District Court.

Section 818 was enacted in 1959 when the State first established its Merit System of Personnel Administration.[1]   The section serves roughly the same function as

[1] The section reads as follows:

"[1] No person in the classified service shall be appointed to, or demoted or dismissed from any position in the classified service, or in any way favored or discriminated against with respect to employment in the classified service because of his political or religious opinions or affiliations, or because of race, creed, color or national origin or by reason of any physical handicap so long as the physical handicap does not prevent or render the employee less able to do the work for which he is employed.

"[2] No person shall use or promise to use, directly or indirectly, any official authority or influence, whether possessed or anticipated, to secure or attempt to secure for any person an appointment or advantage in appointment to a position in the classified service, or an increase in pay or other advantage in employment in any such position, for the purpose of influencing the vote or political action of any person, or for consideration; provided, however, that letters of inquiry, recommendation and reference by public employees of public officials shall not be considered official authority or influence unless such letter contains a threat, intimidation, irrelevant, derogatory or false information.

"[3] No person shall make any false statement, certificate, mark, rating, or report with regard to any test, certification or appointment made under any provision of this Act or in any manner commit any fraud preventing the impartial execution of this Act and rules made hereunder.

"[4] No employee of the department, examiner, or other person shall defeat, deceive, or obstruct any person in his or her right to examination, eligibility, certification, or appointment under this law, or furnish to any person any special or secret information for the purpose of effecting [sic] the rights or prospects of any person with respect to employment in the classified service.

"[5] No person shall, directly or indirectly, give, render, pay, offer, solicit, or accept any money, service, or other valuable consideration for or on account of any appointment, proposed appointment, promotion, or proposed promotion to, or any advantage in, a position in the classified service.

"[6] No employee in the classified service, and no member of the Personnel Board shall, directly or indirectly, solicit, receive, or in

the analogous provisions of the other 49 States,[2] and is patterned on § 9 (a) of the Hatch Act.[3] Without question, a broad range of political activities and con-

any manner be concerned in soliciting or receiving any assessment, subscription or contribution for any political organization, candidacy or other political purpose; and no state officer or state employee in the unclassified service shall solicit or receive any such assessment, subscription or contribution from an employee in the classified service.

"[7] No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office, or shall take part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote.

"[8] Upon a showing of substantial evidence by the Personnel Director that any officer or employee in the state classified service, has knowingly violated any of the provisions of this Section, the State Personnel Board shall notify the officer or employee so charged and the appointing authority under whose jurisdiction the officer or employee serves. If the officer or employee so desires, the State Personnel Board shall hold a public hearing, or shall authorize the Personnel Director to hold a public hearing, and submit a transcript thereof, together with a recommendation, to the State Personnel Board. Relevant witnesses shall be allowed to be present and testify at such hearings. If the officer or employee shall be found guilty by the State Personnel Board of the violation of any provision of this Section, the Board shall direct the appointing authority to dismiss such officer or employee; and the appointing authority so directed shall comply." Okla. Stat. Ann., Tit. 74, § 818 (1965) (paragraph enumeration added).

[2] See Ala. Code, Tit. 55, § 317 (1958); Alaska Stat. § 39.25.160 (1962); Ariz. Rev. Stat. Ann. § 16–1301 (1956), Merit System Regulations and Merit System Board Procedures § 1511 (1966); Ark. Stat. Ann. § 83–119 (1947); Cal. Govt. Code §§ 19730–19735 (1963 and Supp. 1973); Colo. Rev. Stat. Ann. § 26–5–31 (1963), Civil Service Comm'n Rules and Regulations, Art. XIV, § 1; Conn. Gen. Stat. Rev. § 5–266 (Supp. 1969), Regulations of the Civil Service Comm'n Concerning Employees in the State Classified Service § 14–13; Del.

duct is proscribed by the section. Paragraph six, one of the contested portions, provides that "[n]o employee in the classified service . . . shall, directly or indirectly,

Code Ann., Tit. 31, § 110 (1953); Fla. Stat. Ann. § 110.092 (1973); Ga. Merit System of Personnel Administration, Rules and Regulations, Rule 3, ¶¶ 3.101–3.106; Hawaii Rev. Stat. §§ 76–1, 76–91 (1968); Idaho Code § 67–5311 (1973); Ill. Rev. Stat., c. 24½, § 38t (1971); Ind. Ann. Stat. § 60–1341 (1962); Iowa Code Ann. § 19A.18 (Supp. 1973); Kan. Stat. Ann. § 75–2953 (1969); Ky. Rev. Stat. Ann. § 18.310 (1971); La. Const., Art. 14, § 15 (N) (1955); Me. Rev. Stat. Ann., Tit. 5, § 679 (1964); Md. Merit System Rules for Grant-in-Aid Agencies § 602.2; Mass. Gen. Laws Ann., c. 55, §§ 1–15, c. 56, §§ 35–36 (1958 and Supp. 1973); Mich. Rules of Civil Service Comm'n § 7 (1965); Minn. Stat. Ann. § 43.28 (1970); Miss. Merit System Rules, Dept. of Public Welfare, Art. XVI (1965); Mo. Ann. Stat. § 36.150 (1969); Mont. Rev. Codes Ann. §§ 94–1439, 94–1440, 94–1447, 94–1476 (1947); Neb. Rev. Stat. § 81–1315 (1971), Neb. Joint Merit System Regulations for a Merit System, Art. XVI (1963); Nev. Rules for State Personnel Administration, Rules XVI, XIII (1963); N. H. Rev. Stat. Ann. §§ 98:18, 98:19 (1964); N. J. Stat. Ann. § 11:17–2 (1960); N. M. Stat. Ann. § 5–4–42 (1953 and Supp. 1971); N. Y. Civ. Serv. Law § 107 (1973); N. C. Gen. Stat. §§ 126–13 to 126–15 (Supp. 1971); Rules and Regulations of N. D. Merit Systems, Art. XVI; Ohio Rev. Code Ann. §§ 143.41, 143.44, 143.45, 143.46 (1969); Ore. Rev. Stat. § 260.432 (1971); Pa. Stat. Ann., Tit. 71, § 741.904 (Supp. 1973–1974); R. I. Gen. Laws Ann. §§ 36–4–51 to 36–4–53 (1969); S. C. Merit System Rules and Regulations, Civil Defense Council, Art. XIV, § 1; S. D. Merit System Regulations, Art. XVI, § 1 (1963); Tenn. Code Ann. § 8–3121 (Supp. 1971), Tenn. Rules and Regulations for Administering the Civil Service Act § 2.3 (1963); Tex. Penal Code, Arts. 195–197 (1952); Utah Code Ann. § 67–13–13 (1968); Vt. Rules and Regulations for Personnel Administration § 3.02; Va. Supp. to Rules for the Administration of the Va. Personnel Act, Rule 15.14 (A); Wash. Rev. Code Ann. § 41–06–250 (1969); W. Va. Code Ann. § 29–6–19 (1971); Wis. Stat. Ann. § 16.30 (1972); Wyo. Rev. Rules and Regulations, Rule XIII (1960). (For compilation of state rules and regulations, see 2 Commission on Political Activity of Government Personnel, Research 122 *et seq.* (1967).)

[3] 5 U. S. C. § 7324 (a). See generally *CSC* v. *Letter Carriers, ante,* p. 548.

solicit, receive, or in any manner be concerned in soliciting or receiving any assessment . . . or contribution for any political organization, candidacy or other political purpose." Paragraph seven, the other challenged paragraph, provides that no such employee "shall be a member of any national, state or local committee of a political party, or an officer or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office." That paragraph further prohibits such employees from "tak[ing] part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote." As a complementary proscription (not challenged in this lawsuit) the first paragraph prohibits any person from "in any way" being "favored or discriminated against with respect to employment in the classified service because of his political . . . opinions or affiliations." Responsibility for maintaining and enforcing § 818's proscriptions is vested in the State Personnel Board and the State Personnel Director, who is appointed by the Board. Violation of § 818 results in dismissal from employment and possible criminal sanctions and limited state employment ineligibility. Okla. Stat. Ann., Tit. 74, §§ 818 and 819.

Appellants do not question Oklahoma's right to place even-handed restrictions on the partisan political conduct of state employees. Appellants freely concede that such restrictions serve valid and important state interests, particularly with respect to attracting greater numbers of qualified people by insuring their job security, free from the vicissitudes of the elective process, and by protecting them from "political extortion." [4] See *United Public Workers v. Mitchell,* 330 U. S. 75, 99–103 (1947). Rather, appellants maintain that however permissible,

---

[4] Brief for Appellants 22.

even commendable, the goals of § 818 may be, its language is unconstitutionally vague and its prohibitions too broad in their sweep, failing to distinguish between conduct that may be proscribed and conduct that must be permitted. For these and other reasons,[5] appellants assert that the sixth and seventh paragraphs of § 818 are void *in toto* and cannot be enforced against them or anyone else.[6]

We have held today that the Hatch Act is not impermissibly vague. *CSC* v. *Letter Carriers, ante,* p. 548. We have little doubt that § 818 is similarly not so vague that "men of common intelligence must necessarily guess at its meaning." *Connally* v. *General Construction Co.,* 269 U. S. 385, 391 (1926). See *Grayned* v. *City of Rockford,* 408 U. S. 104, 108–114 (1972); *Colten* v. *Kentucky,* 407 U. S. 104, 110–111 (1972); *Cameron* v. *Johnson,* 390 U. S. 611, 616 (1968). Whatever other problems there are with § 818, it is all but frivolous to suggest that the section fails to give adequate warning of what activities it proscribes or fails to set out "explicit standards" for those who must apply it. *Grayned* v. *City of Rockford, supra,* at 108. In the plainest language, it

---

[5] Appellants also claim that § 818 violates the Equal Protection Clause of the Fourteenth Amendment by singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions. The contention is somewhat odd in the context of appellants' principal claim, which is that § 818 reaches too far rather than not far enough. In any event, the legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated. See *McGowan* v. *Maryland,* 366 U. S. 420 (1961). And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.

[6] Only the sixth and seventh paragraphs of § 818 are at issue in this lawsuit. Hereinafter, references to § 818 should be understood to be limited to those paragraphs, unless we indicate to the contrary.

prohibits any state classified employee from being "an officer or member" of a "partisan political club" or a candidate for "any paid public office." It forbids solicitation of contributions "for any political organization, candidacy or other political purpose" and taking part "in the management or affairs of any political party or in any political campaign." Words inevitably contain germs of uncertainty and, as with the Hatch Act, there may be disputes over the meaning of such terms in § 818 as "partisan," or "take part in," or "affairs of" political parties. But what was said in *Letter Carriers, ante,* at 578–579, is applicable here: "there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." [7] Moreover, even if the outermost boundaries of § 818 may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the "hard core" of the statute's proscriptions and appellants concede as much.[8] See *Dombrowski* v. *Pfister,* 380 U. S. 479, 491–492 (1965); *United States* v. *National Dairy Products Corp.,* 372 U. S. 29 (1963); *Williams* v. *United States,* 341 U. S. 97 (1951); *Robinson* v. *United States,* 324 U. S. 282, 286 (1945); *United States* v. *Wurzbach,* 280 U. S. 396 (1930).

---

[7] It is significant in this respect to note that § 818 does not create a "regulatory maze" where those uncertain may become hopelessly lost. See *Keyishian* v. *Board of Regents,* 385 U. S. 589, 604 (1967). Rather, the State Personnel Board is available to rule in advance on the permissibility of particular conduct under the explicit standards set out in and under § 818. See Tr. of Rec. 237. See *CSC* v. *Letter Carriers, ante,* at 580.

[8] Tr. of Oral Arg. 48–49.

Shortly before appellants commenced their action in the District Court, they were charged by the State Personnel Board with patent violations of § 818.[9] According to the Board's charges, appellants actively participated in the 1970 re-election campaign of a Corporation Commissioner, appellants' superior. All three allegedly asked other Corporation Commission employees (individually and in groups) to do campaign work or to give referrals to persons who might help in the campaign. Most of these requests were made at district offices of the Commission's Oil and Gas Conservation Division. Two of the appellants were charged with soliciting money for the campaign from Commission employees and one was also charged with receiving and distributing campaign posters in bulk. In the context of this type of obviously covered conduct, the statement of Mr. Justice Holmes is particularly appropriate: "if there is any difficulty . . . it will be time enough to consider it when raised by someone whom it concerns." *United States* v. *Wurzbach, supra,* at 399.

Appellants assert that § 818 has been construed as applying to such allegedly protected political expression as the wearing of political buttons or the displaying

---

[9] The District Court initially requested the parties to brief the question whether appellants were required to complete the Board's proceedings prior to bringing their action under 42 U. S. C. § 1983. The Board, however, on appellants' application, ordered its proceedings stayed pending adjudication of the federal constitutional questions in the District Court. When advised of the Board's decision, and in the absence of any objections from appellees, the District Court proceeded. On this record, we need not consider whether appellants would have been required to proceed to hearing before the Board prior to pursuing their § 1983 action. Cf. *Gibson* v. *Berryhill,* 411 U. S. 564, 574–575 (1973); H. Hart & H. Wechsler, The Federal Courts and The Federal System 983–985 (2d ed. 1973).

of bumper stickers.[10]  But appellants did not engage in any such activity.  They are charged with actively engaging in partisan political activities—including the solicitation of money—among their coworkers for the benefit of their superior.  Appellants concede—and correctly so, see *Letter Carriers, supra*—that § 818 would be constitutional as applied to this type of conduct.[11]  They nevertheless maintain that the statute is overbroad and purports to reach protected, as well as unprotected conduct, and must therefore be struck down on its face and held to be incapable of any constitutional application.  We do not believe that the overbreadth doctrine may appropriately be invoked in this manner here.

Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.  See, *e. g., Austin* v. *The Aldermen,* 7 Wall. 694, 698–699 (1869); *Supervisors* v. *Stanley,* 105 U. S. 305, 311–315 (1882); *Hatch* v. *Reardon,* 204 U. S. 152, 160–161 (1907); *Yazoo & M. V. R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217, 219–220 (1912); *United States* v. *Wurzbach, supra,* at 399; *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 513 (1937); *United States* v. *Raines,* 362 U. S. 17 (1960).  A closely related principle is that constitutional rights are personal and may not be asserted vicariously.  See *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961).  These principles rest on more than the fussiness of judges.  They reflect the conviction that under our constitutional system courts

---

[10] The State Personnel Board has so interpreted § 818.  See Merit System of Personnel Administration Rules § 1641; the Board's official circular, Tr. of Rec. 237.

[11] Tr. of Oral Arg. 48–49.

are not roving commissions assigned to pass judgment on the validity of the Nation's laws. See *Younger* v. *Harris*, 401 U. S. 37, 52 (1971). Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court:

> "So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty." *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803).

In the past, the Court has recognized some limited exceptions to these principles, but only because of the most "weighty countervailing policies." *United States* v. *Raines*, 362 U. S., at 22–23.[12] One such exception is where individuals not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves. See *Eisenstadt* v. *Baird*, 405 U. S. 438, 444–446 (1972); *NAACP* v. *Alabama*, 357 U. S. 449 (1958). Another exception has been carved out in the area of the First Amendment.

It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression

---

[12] See generally Hart & Wechsler, *supra*, at 184–214; Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L. J. 599 (1962); Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844 (1970).

has to give way to other compelling needs of society. *Herndon* v. *Lowry,* 301 U. S. 242, 258 (1937); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960); *Grayned* v. *City of Rockford,* 408 U. S., at 116–117. As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area—"attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski* v. *Pfister,* 380 U. S., at 486. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate "only spoken words." *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972). See *Cohen* v. *California,* 403 U. S. 15 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes. Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations. See *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *United States* v. *Robel,* 389 U. S. 258 (1967); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964); *Shelton* v. *Tucker, supra.* Facial

overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct, see *Grayned* v. *City of Rockford, supra,* at 114–121; *Cameron* v. *Johnson,* 390 U. S., at 617–619; *Zwickler* v. *Koota,* 389 U. S. 241, 249–250 (1967); *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), and where such conduct has required official approval under laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights. See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Cox* v. *Louisiana,* 379 U. S. 536, 553–558 (1965); *Kunz* v. *New York,* 340 U. S. 290 (1951); *Lovell* v. *Griffin,* 303 U. S. 444 (1938).

The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute. See *Dombrowski* v. *Pfister,* 380 U. S., at 491; *Cox* v. *New Hampshire,* 312 U. S. 569 (1941); *United States* v. *Thirty-seven Photographs,* 402 U. S. 363 (1971); cf. *Breard* v. *Alexandria,* 341 U. S. 622 (1951). Equally important, overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct. In *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), Jesse Cantwell, a Jehovah's Witness, was convicted of common-law breach of the peace for playing a phonograph record attacking the

Catholic Church before two Catholic men on a New Haven street. The Court reversed the judgment affirming Cantwell's conviction, but only on the ground that his conduct, "considered in the light of the constitutional guarantees," could not be punished under "the common law offense in question." *Id.*, at 311 (footnote omitted). The Court did not hold that the offense "known as breach of the peace" must fall *in toto* because it was capable of some unconstitutional applications, and, in fact, the Court seemingly envisioned its continued use against "a great variety of conduct destroying or menacing public order and tranquility." *Id.*, at 308. See *Garner* v. *Louisiana,* 368 U. S. 157, 202–203, 205 (1961) (Harlan, J., concurring in judgment). Similarly, in reviewing the statutory breach-of-the-peace convictions involved in *Edwards* v. *South Carolina,* 372 U. S. 229 (1963), and *Cox* v. *Louisiana, supra,* at 544–552, the Court considered in detail the State's evidence and in each case concluded that the conduct at issue could not itself be punished under a breach-of-the-peace statute. On that basis, the judgments affirming the convictions were reversed.[13] See also *Teamsters Union* v. *Vogt, Inc.,* 354 U. S. 284 (1957). Additionally, overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner. See *United States*

---

[13] In both *Edwards* and *Cox,* at the very end of the discussions, the Court also noted that the statutes would be facially unconstitutional for overbreadth. See 372 U. S. 229, 238; 379 U. S. 536, 551–552. In *Cox,* the Court termed this discussion an "additional reason" for its reversal. 379 U. S., at 551. These "additional" holdings were unnecessary to the dispositions of the cases, so much so that only one Member of this Court relied on *Cox's* "additional" holding in *Brown* v. *Louisiana,* 383 U. S. 131 (1966), which involved convictions under the very same breach-of-the-peace statute. See *id.*, at 143–150 (BRENNAN, J., concurring in judgment).

v. *Harriss,* 347 U. S. 612 (1954) ; *United States* v. *CIO,* 335 U. S. 106 (1948) ; cf. *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969) ; *Pickering* v. *Board of Education,* 391 U. S. 563, 565 n. 1 (1968) ; *Eastern Railroad Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961).

It remains a "matter of no little difficulty" to determine when a law may properly be held void on its face and when "such summary action" is inappropriate. *Coates* v. *City of Cincinnati,* 402 U. S. 611, 617 (1971) (opinion of Black, J.). But the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. Cf. *Alderman* v. *United States,* 394 U. S. 165, 174–175 (1969). To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-

case analysis of the fact situations to which its sanctions, assertedly, may not be applied.[14]

Unlike ordinary breach-of-the-peace statutes or other broad regulatory acts, § 818 is directed, by its terms, at political expression which if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments. But at the same time, § 818 is not a censorial statute, directed at particular groups or viewpoints. Cf. *Keyishian* v. *Board of Regents, supra.* The statute, rather, seeks to regulate political activity in an even-handed and neutral manner. As indicated, such statutes have in the past been subject to a less exacting overbreadth scrutiny. Moreover, the fact remains that § 818 regulates a substantial spectrum of conduct that is as manifestly subject to state regulation as the public peace or criminal trespass. This much was established in *United Public Workers* v. *Mitchell,* and has been unhesitatingly reaffirmed today in *Letter Carriers, supra.* Under the decision in *Letter Carriers,* there is no question that § 818 is valid at least insofar as it forbids classified employees from: soliciting contributions for partisan candidates, political parties, or other partisan political purposes; becoming members of national, state, or local committees of political parties, or officers or committee members in partisan political clubs,

---

[14] My Brother BRENNAN asserts that in some sense a requirement of substantial overbreadth is already implicit in the doctrine. *Post,* at 630. This is a welcome observation. It perhaps reduces our differences to our differing views of whether the Oklahoma statute is substantially overbroad. The dissent also insists that *Coates* v. *City of Cincinnati,* 402 U. S. 611 (1971), must be taken as overruled. But we are unpersuaded that *Coates* stands as a barrier to a rule that would invalidate statutes for overbreadth only when the flaw is a substantial concern in the context of the statute as a whole. Our judgment is that the Oklahoma statute, when authoritative administrative constructions are accepted, is not invalid under such a rule.

or candidates for any paid public office; taking part in the management or affairs of any political party's partisan political campaign; serving as delegates or alternates to caucuses or conventions of political parties; addressing or taking an active part in partisan political rallies or meetings; soliciting votes or assisting voters at the polls or helping in a partisan effort to get voters to the polls; participating in the distribution of partisan campaign literature; initiating or circulating partisan nominating petitions; or riding in caravans for any political party or partisan political candidate.

These proscriptions are taken directly from the contested paragraphs of § 818, the Rules of the State Personnel Board and its interpretive circular, and the authoritative opinions of the State Attorney General. Without question, the conduct appellants have been charged with falls squarely within these proscriptions.

Appellants assert that § 818 goes much farther than these prohibitions. According to appellants, the statute's prohibitions are not tied tightly enough to *partisan* political conduct and impermissibly relegate employees to expressing their political views "privately." The State Personnel Board, however, has construed § 818's explicit approval of "private" political expression to include virtually any expression not within the context of active partisan political campaigning,[15] and the State's Attorney General, in plain terms, has interpreted § 818 as prohibiting "clearly partisan political activity" only.[16]

---

[15] The Board's interpretive circular states (Tr. of Rec. 237):

"The right to express political opinions is reserved to all such persons. Note: This reservation is subject to the prohibition that such persons may not take active part in political management or in political campaigns."

[16] Op. Atty. Gen. Okla., No. 68–356, p. 4 (1968). The District Court similarly interpreted § 818 as intending to permit public expressions of political opinion "so long as the employee does

Surely a court cannot be expected to ignore these authoritative pronouncements in determining the breadth of a statute. *Law Students Research Council* v. *Wadmond,* 401 U. S. 154, 162–163 (1971). Appellants further point to the Board's interpretive rules purporting to restrict such allegedly protected activities as the wearing of political buttons or the use of bumper stickers. It may be that such restrictions are impermissible and that § 818 may be susceptible of some other improper applications. But, as presently construed, we do not believe that § 818 must be discarded *in toto* because some persons' arguably protected conduct may or may not be caught or chilled by the statute. Section 818 is not substantially overbroad and is not, therefore, unconstitutional on its face.

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

This case in my view should be governed by some of the considerations I set forth in my dissent in the *Letter Carriers* case, *ante,* p. 595.

Section 818, par. 7, of the Oklahoma Act states:

> "No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer or member of a committee *of a partisan political club,* or a candidate for nomination or election to any paid public office, or *shall take part in the management or affairs* of any political party *or in any political campaign,* except to exercise his right as a citizen privately

not channel his activity towards party success." 338 F. Supp. 711, 716. Although the Court's interpretation is obviously not binding on state authorities, see *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971), a federal court must determine what a state statute means before it can judge its facial constitutionality.

to express his opinion and to cast his vote." (Emphasis supplied.)

If this were a regulation of business or commercial matters the Court's citation of *Connally* v. *General Construction Co.*, 269 U. S. 385, 391, would be apt. *Connally* was a case involving a state law making it a crime for contractors with the State to pay their workmen less than the "current rate of per diem wages in the locality where the work is performed." The Court held the Act too vague to pass muster as a penal measure. I would concede that by the *Connally* test § 818, par. 7, would not fall. For the provision in question bars an employee from taking "part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote."

But the problem here concerns not commerce but the First Amendment. The First Amendment goes further than protecting a person for "privately" expressing his opinion. Public as well as private discourse is included; and the emphasis in § 818, par. 7, that *private* expression of views is tolerated emphasizes that public expression is not tolerated.

I do not see how government can deprive its employees of the right to speak, write, assemble, or petition once the office is closed and the employee is home on his own. Public discussion of local, state, national, and international affairs is grist for the First Amendment mill. Our decisions emphasize that free debate, uninhibited discussion, robust and wide-open controversy, a multitude of tongues, the pressure of ideas clear across the spectrum set the pattern of First Amendment freedoms. We emphasized in *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 272, that neither injury "to official reputation" nor "factual error" justified repression of

speech, that the demands of free speech lowered the barriers to libel actions for charges of official misconduct or improprieties.

First Amendment rights are indeed fundamental, for "we the people" are the sovereigns, not those who sit in the seats of the mighty. It is the voice of the people who ultimately have the say; once we fence off a group, and bar them from public dialogue, the public interest is the loser. Those who are tied into the federal regime either by direct employment or by state projects federally financed now amount to about five and a half million. The number included, if all state employees are added, is estimated* at over 13 million.

These people are scrubwomen, janitors, typists, file clerks, chauffeurs, messengers, nurses, orderlies, policemen and policewomen, night watchmen, telephone and elevator operators, as well as those doing some kind of administrative, executive, or judicial work. There are activities that do not touch on First Amendment rights which can be banned. There are illegal election procedures such as wiretapping, burglary, and mailing politically salacious letters that are beyond the pale. The First Amendment, however, concerns a variety of activities that are deep in our tradition: forming *ad hoc* committees to lobby measures through a council or other legislative body; organizing protective associations to protect lakes, rivers, islands of wilderness, or a neighborhood; preparing and circulating petitions for signatures in support of legislative reforms; making protest marches or picketing the statehouse for a public cause—these as well as debate, passing out campaign literature, watching at the polls, making radio and TV appearances, addressing rallies in parks or auditoriums, are all part of the intense process of mobilizing "we the people" for or against

*Statistical Abstract of the United States 1972, pp. 403, 431.

specific measures, shaping public opinion, getting X rather than Y elected, and so on.

A bureaucracy that is alert, vigilant, and alive is more efficient than one that is quiet and submissive. It is the First Amendment that makes it alert, vigilant, and alive. It is suppression of First Amendment rights that creates faceless, nameless bureaucrats who are inert in their localities and submissive to some master's voice. High values ride on today's decision in this case and in *Letter Carriers*. I would not allow the bureaucracy in the State or Federal Government to be deprived of First Amendment rights. Their exercise certainly is as important in the public sector as it is in the private sector. Those who work for government have no watered-down constitutional rights. So far as the First Amendment goes, I would keep them on the same plane as all other people.

I would reverse the judgment below.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEW-ART and MR. JUSTICE MARSHALL join, dissenting.

Whatever one's view of the desirability or constitutionality of legislative efforts to restrict the political activities of government employees, one must regard today's decision upholding § 818 of the Oklahoma Merit System of Personnel Administration Act [1] as a wholly

---

[1] Okla. Stat. Ann., Tit. 74, § 818, provides in pertinent part:

"No employee in the classified service, and no member of the Personnel Board shall, directly or indirectly, solicit, receive, or in any manner be concerned in soliciting or receiving any assessment, subscription or contribution for any political organization, candidacy or other political purpose; and no state officer or state employee in the unclassified service shall solicit or receive any such assessment, subscription or contribution from an employee in the classified service.

"No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer

unjustified retreat from fundamental and previously well-established First and Fourteenth Amendment principles. For the purposes of this decision, the Court assumes—perhaps even concedes—that the statute at issue here sweeps too broadly, barring speech and conduct that are constitutionally protected even under the standards announced in *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947), and reiterated today in *CSC* v. *Letter Carriers, ante,* p. 548. Nevertheless, the Court rejects appellants' contention that the statute is unconstitutional on its face, reasoning that "where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Ante,* at 615–616. That conclusion finds no support in previous decisions of this Court, and it effectively overrules our decision just two Terms ago in *Coates* v. *City of Cincinnati,* 402 U. S. 611 (1971). I remain convinced that *Coates* was correctly decided, and I must therefore respectfully dissent.

As employees of the Corporation Commission of the State of Oklahoma, a state agency, appellants are subject to the provisions of the State's Merit Act. That Act designates certain state agencies, including the Corporation Commission, which are barred from dismissing or suspending classified employees for political reasons.

---

or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office, or shall take part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote."

At the same time, the Act authorizes the State Personnel Board to dismiss or suspend any classified employee who engages in certain prohibited political activity. Although specifically protecting an employee's right "as a citizen privately to express his opinion and to cast his vote," the Act bars (1) fund raising for any political purpose; (2) membership in any national, state, or local committee of a political party or a political club; (3) candidacy for any public office; and (4) participation "in the management or affairs of any political party or in any political campaign."

As a result of appellants' alleged participation in the 1970 re-election campaign of Corporation Commissioner Ray C. Jones, the State Personnel Board formally charged appellants with violations of the Act. Appellants then brought this action under 42 U. S. C. § 1983 before a three-judge Federal District Court in the Western District of Oklahoma, seeking an injunction against enforcement of the Act. The District Court rejected appellants' contentions that the Act is unconstitutionally vague and overbroad, and the Court today affirms that determination.

Appellants' claims are, of course, similar to the vagueness and overbreadth contentions rejected by the Court today in upholding § 9 (a) of the Hatch Act, 5 U. S. C. § 7324 (a)(2). See *Letter Carriers, supra.* But that decision, whether or not correct, is by no means controlling on the questions now before us. Certain fundamental differences between the Hatch Act and the Oklahoma Merit Act should, at the outset, be made clear.

Section 9 (a) of the Hatch Act provides that a Federal Government employee may not "(1) use his official authority or influence for the purpose of interfering with or affecting the result of an election; or (2) take an active part in political management or in political cam-

paigns." Although recognizing that the meaning of the Act's critical phrase, "an active part in political management or in political campaigns," is hardly free from ambiguity, the Court concluded that the terms could be defined by reference to a complex network of Civil Service Commission regulations developed over many years and comprehensively restated in 1970. See 5 CFR § 733. Those regulations make clear that among the rights retained by a federal employee, notwithstanding the arguably contrary language of the statute, are the rights to "[e]xpress his opinion as an individual privately and publicly on political subjects and candidates"; to "[d]isplay a political picture, sticker, badge, or button"; to "[b]e a member of a political party or other political organization . . ."; and to "[m]ake a financial contribution to a political party or organization." 5 CFR § 733.111.

By contrast, the critical phrase of the Oklahoma Act—no employee shall "take part in the management or affairs of any political party or in any political campaign"—is left almost wholly undefined. While the Act does specifically declare that employees have the right to express their views "privately," it nowhere defines the terms "take part" or "management" or "affairs." The reservation of the right to express one's views in private could, moreover, be thought to mean that any public expression of views is forbidden. Of course, the Oklahoma Act can, like its federal counterpart, be viewed in conjunction with the applicable administrative regulations. But in marked contrast with the elaborate set of regulations purporting to define the prohibitions of the Hatch Act, the pertinent regulations of the State Personnel Board are a scant five rules that shed no light at all on the intended reach of the statute. Two

of those rules merely recite the language of the Act.[2]
A third offers no more specific guidance than the general
exhortation that a classified employee shall "pursue the
common good, and, not only be impartial, but so act as
neither to endanger his impartiality nor to give occasion
for distrust of his impartiality."[3]   A fourth provides

---

[2] Oklahoma Merit System of Personnel Administration Rule 1630
(1971) provides:

"No employee in the classified service, and no member of the
Personnel Board shall, directly or indirectly, solicit, receive, or in any
manner be concerned in soliciting or receiving any assessment, sub-
scription or contribution for any political organization, candidacy
or other political purpose; and no state officer or state employee in
the unclassified service shall solicit or receive any such assessment,
subscription or contribution from an employee in the classified
service."

Rule 1640 provides:

"No employee in the classified service shall be a member of any
national, state or local committee of a political party, or an officer
or member of a committee of a partisan political club or a candidate
for nomination or election to any paid public office, or shall take
part in the management or affairs of any political party or in any
political campaign, except to exercise his right as a citizen privately
to express his opinion and to cast his vote."

Compare n. 1, *supra*.

[3] Rule 1625 provides:

"Every classified employee shall fulfill to the best of his ability
the duties of the office of [*sic*] position conferred upon him and shall
prove himself in his behavior, inside and outside, the worth of the
esteem which his office or position requires.   In his official activities
the classified employee shall pursue the common good, and, not only
be impartial, but so act as neither to endanger his impartiality
nor to give occasion for distrust of his impartiality.

"A classified employee shall not engage in any employment, ac-
tivity or enterprise which has been determined to be inconsistent,
incompatible, or in conflict with his duties as a classified employee
or with the duties, functions or responsibilities of the Appointing
Authority by which he is employed.

"Each Appointing Authority shall determine and prescribe those

that a classified employee must resign his position "prior to filing as a candidate for public office, seeking or accepting nomination for election or appointment as an official of a political party"—again, merely tracking the language of the Act.[4] The fifth, Rule 1641, far from clarifying or limiting the scope of the Act, provides the major thrust to appellants' overbreadth contention. The rule declares that "[a]n employee in the classified service may not wear a political badge, button, or similar partisan emblem, nor may such employee display a partisan political sticker or sign on an automobile operated by

activities which, for employees under its jurisdiction, will be considered inconsistent, incompatible or in conflict with their duties as classified employees. In making this determination the Appointing Authority shall give consideration to employment, activity or enterprise which: (a) involves the use for private gain or advantage of state time, facilities, equipment and supplies; or, the badge, uniform, prestige or influence of one's state office of employment, or (b) involves receipt or acceptance by the classified employee of any money or other consideration from anyone, other than the State, for the performance of an act which the classified employee would be required or expected to render in the regular course or hours of his state employment or as a part of his duties as a state classified employee, or (c) involves the performance of an act in other than his capacity as a state classified employee which act may later be subject directly or indirectly to the control, inspection, review, audit or enforcement by such classified employee or the agency by which he is employed.

"Each classified employee shall during his hours of duty and subject to such other laws, rules and regulations as pertain thereto, devote his full time, attention and efforts to his office or employment."

[4] Rule 1209.2 provides:

"Any classified employee shall resign his position prior to filing as a candidate for public office, seeking or accepting nomination for election or appointment as an official of a political party, partisan political club or organization or serving as a member of a committee of any such group or organization."

him or under his control.".[5] Even the Court concedes that a ban on the wearing of buttons or the display of bumper stickers may be "impermissible." *Ante,* at 618.

It is possible, of course, that the inherent ambiguity of the Oklahoma statute might be cured by judicial construction of its terms. But the Oklahoma Supreme Court has never attempted to construe the Act or narrow its apparent reach. Plainly, this Court cannot undertake that task. *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972); *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971).[6] I must assume, therefore, that the Act, subject to whatever gloss is provided by the administrative regulations,[7] is capable of applications that would prohibit speech and conduct clearly protected by the First Amendment. Even on the assumption that the

---

[5] Rule 1641 also provides:

"Continued use or display of such political material shall be deemed willful intent to violate the provisions of 74 O. S. 1961 § 818 relating to prohibited political activities of classified State employees and shall subject such employee to dismissal pursuant to said statute."

[6] See also *Niemotko* v. *Maryland,* 340 U. S. 268, 285 (1951) (Frankfurter, J., concurring in the result in related case of *Kunz* v. *New York,* 340 U. S. 290 (1951)): "It is not for this Court to formulate with particularity the terms of a permit system which would satisfy the Fourteenth Amendment."

[7] In addition to the regulations promulgated by the State Personnel Board, the Court places some reliance on an interpretive circular issued by the Board and on certain opinions issued by the State Attorney General. Even assuming that these constructions should properly be considered in gauging the reach of the Act, they offer little real guidance to the meaning of the terms. The circular, for example, states that "The right to express political opinions is reserved to all such persons. Note: This reservation is subject to the prohibition that such persons may not take active part in political management or in political campaigns." See *ante,* at 617 n. 15. The second half of that statement merely restates the provision of

statute's regulatory aim is permissible, the manner in which state power is exercised is one that unduly infringes protected freedoms. *Shelton* v. *Tucker,* 364 U. S. 479, 489 (1960); *Cantwell* v. *Connecticut,* 310 U. S. 296, 304 (1940). The State has failed, in other words, to provide the necessary "sensitive tools" to carry out the "separation of legitimate from illegitimate speech." *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958). See *NAACP* v. *Button,* 371 U. S. 415, 433 (1963).

Although the Court does not expressly hold that the statute is vague and overbroad, it does assume not only that the ban on the wearing of badges and buttons may be "impermissible," but also that the Act "may be susceptible of some other improper applications." *Ante,* at 618. Under principles that I had thought were established beyond dispute, that assumption requires a finding that the statute is unconstitutional on its face. Ordinarily, "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States* v. *Raines,* 362 U. S. 17, 21 (1960).[8] And appellants apparently concede that

------

the Act. The first half can hardly be said to convey any fixed meaning. In fact, given the statement in the Act that the right to make a private expression of political views is protected, an employee might reasonably interpret the circular to mean that "The right to express political opinions is reserved to all such persons, provided that such expression is not made in public." Similarly, the Court makes reference to an Opinion of the Attorney General holding, "in plain terms," *ante,* at 617, that the Act applies only to "clearly partisan political activity." I am at a loss to see how these statements offer any clarification of the provisions of the Act.

[8] *Raines* concerned a prosecution under § 131 of the Civil Rights Act of 1957, charging that the defendants, in their capacity as

the State could prohibit the conduct with which they were charged without infringing the guarantees of the First Amendment. Nevertheless, we have repeatedly recognized that "the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Gooding* v. *Wilson, supra,* at 521, quoting from *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965).[9] We have adhered to that view because the guarantees of the First Amendment are "delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Cf. *Smith* v. *California,* [361 U. S. 147, 151–154 (1959)]." *NAACP* v. *Button, supra,* at 433. The mere existence of a statute that sweeps too broadly in areas protected by the First Amendment "results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. . . .

---

state officials, had discriminated against blacks who desired to register to vote. The defendants' conduct plainly fell within the permissible reach of the statute. But more importantly, it was not even suggested that the statute might conceivably be used to punish the exercise of First Amendment rights. While stating the general rule that a defendant normally may not assert the constitutional rights of a person not a party, *Raines* did specifically recognize that the rule is suspended in cases where its application would "itself have an inhibitory effect on freedom of speech." 362 U. S. 17, 22. Cf. *United States* v. *National Dairy Corp.,* 372 U. S. 29 (1963); *Yazoo & M. V. R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217 (1912).

[9] See also *Kunz* v. *New York,* 340 U. S. 290 (1951); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949).

Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." *Thornhill* v. *Alabama,* 310 U. S. 88, 98 (1940). See Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 853–854 (1970).

Although the Court declines to hold the Oklahoma Act unconstitutional on its face, it does expressly recognize that overbreadth review is a necessary means of preventing a "chilling effect" on protected expression. Nevertheless, the Court reasons that the function of the doctrine "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Ante,* at 615. Where conduct is involved, a statute's overbreadth must henceforth be "substantial" before the statute can properly be found invalid on its face.

I cannot accept the validity of that analysis. In the first place, the Court makes no effort to define what it means by "substantial overbreadth." We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine. Cf. Note, The First Amendment Overbreadth Doctrine, *supra,* at 858–860, 918. Whether the Court means to require some different or greater showing of substantiality is left obscure by today's opinion, in large part because the Court makes no effort to explain why

the overbreadth of the Oklahoma Act, while real, is somehow not quite substantial. No more guidance is provided than the Court's conclusory assertion that appellants' showing here falls below the line.

More fundamentally, the Court offers no rationale to explain its conclusion that, for purposes of overbreadth analysis, deterrence of conduct should be viewed differently from deterrence of speech, even where both are equally protected by the First Amendment. Indeed, in the case before us it is hard to know whether the protected activity falling within the Act should be considered speech or conduct. In any case, the conclusion that a distinction should be drawn was the premise of MR. JUSTICE WHITE's dissenting opinion in *Coates* v. *City of Cincinnati,* 402 U. S. 611, 620–621 (1971), and that conclusion—although squarely rejected in *Coates*—has now been adopted by the Court.

At issue in *Coates* was a city ordinance making it an offense for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . ." *Id.,* at 611. There can be no doubt that the ordinance was held unconstitutional on its face, and not merely unconstitutional as applied to particular, protected conduct. For the Court expressly noted that the ordinance was "aimed directly at activity protected by the Constitution. We need not lament that we do not have before us the details of the conduct found to be annoying. It is the ordinance on its face that sets the standard of conduct and warns against transgression. The details of the offense could no more serve to validate this ordinance than could the details of an offense charged under an ordinance suspending unconditionally the right of assembly and free speech." *Id.,* at 616. In dissent, MR. JUSTICE WHITE maintained that since the ordinance

prohibited persons from "assembling and 'conduct[ing]'
themselves in a manner annoying to other persons," he
would "deal with the Cincinnati ordinance as we would
with the ordinary criminal statute.   The ordinance clearly
reaches certain conduct but may be illegally vague with
respect to other conduct.   The statute is not infirm on
its face and since we have no information from this record
as to what conduct was charged against these defendants,
we are in no position to judge the statute as applied.
That the ordinance may confer wide discretion in a wide
range of circumstances is irrelevant when we may be
dealing with conduct at its core."   *Id.*, at 620–621.
Thus, *Coates* stood, until today, for the proposition that
where a statute is "unconstitutionally broad because it
authorizes the punishment of constitutionally protected
conduct," *id.*, at 614, it must be held invalid on its
face whether or not the person raising the challenge
could have been prosecuted under a properly narrowed
statute.[10]   The Court makes no attempt to distinguish
*Coates,* implicitly conceding that the decision has been
overruled.

   At this stage, it is obviously difficult to estimate the
probable impact of today's decision.   If the requirement
of "substantial" overbreadth is construed to mean only
that facial review is inappropriate where the likelihood
of an impermissible application of the statute is too small
to generate a "chilling effect" on protected speech or
conduct, then the impact is likely to be small.   On the

---

   [10] The Court has applied overbreadth review to many other
statutes that assertedly had a "chilling effect" on protected conduct,
rather than on "pure speech."   See, *e. g., United States* v. *Robel,*
389 U. S. 258 (1967); *Aptheker* v. *Secretary of State, supra; Thorn-
hill* v. *Alabama,* 310 U. S. 88 (1940).   In none of these cases, or
others involving conduct rather than speech, did the Court suggest
that a defendant would lack standing to raise the overbreadth claim
if his conduct could be proscribed by a narrowly drawn statute.

other hand, if today's decision necessitates the drawing of artificial distinctions between protected speech and protected conduct, and if the "chill" on protected conduct is rarely, if ever, found sufficient to require the facial invalidation of an overbroad statute, then the effect could be very grave indeed. In my view, the principles set forth in *Coates* v. *City of Cincinnati,* are essential to the preservation and enforcement of the First Amendment guarantees. Since no subsequent development has persuaded me that the principles are ill-founded or that *Coates* was incorrectly decided, I would reverse the judgment of the District Court on the strength of that decision and hold § 818 of the Oklahoma Merit Act unconstitutional on its face.