OSTERHAUS, J.
The Bennetts own a beachfront triplex and adjacent lot known as “The Lawn” in south Walton County that they rent many times each year for weddings, graduation parties, reunions, and other events. Their property sits within a county-designated “Residential Preservation Area” district surrounded by family dwellings. In 2010, the Bennetts’ neighbors began to complain to the County about events held on the Lawn after about 30 wedding/event rentals had occurred in 2009 and more were being held in 2010. The County responded by citing the Bennetts three times between February 2010 and April 2011, for making “non-residential use” of their property in violation of Walton County’s Land Development Code (LDC). In response, the Bennetts sued the County, alleging, among other things, that the County’s ambiguous restriction and arbitrary enforcement violated their substantive due process rights. After the parties filed cross motions for summary judgment on the claim,, the trial court ruled for the County. The Bennetts appealed and now we affirm.
I.
The trial court’s summary judgment ruling on the Bennetts’ challenge to the LDC involves a pure question of law that we review de novo on appeal. Kuvin v. City of Coral Gables, 62 So.3d 625, 629 (Fla. 3d DCA 2010) (citing Caribbean Conser. Corp. v. Fla. Fish & Wildlife Conserv. Comm’n, 838 So.2d 492, 500 (Fla.2003).
A.
Florida law authorizes counties and local governments to regulate local land *388 development and promulgate zoning regulations. M & H Profit, Inc. v. City of Panama City, 28 So.3d 71, 77 (Fla. 1st DCA 2009). This case involves a provision of Walton County’s LDC dealing with the preservation of residential neighborhoods. Section 2.01.03(L)(3)(á)(iii) of the LDC provides that “[n]on-residential uses are not allowed” on lots within County-designated Residential Preservation Areas, such as the Bennetts’ triplex and the Lawn.
Courts examine substantive due process challenges to zoning regulations, like the Bennetts’ case here, using the rational basis test, analyzing whether the regulation rationally relates to a legitimate governmental purpose. WCI Communities, Inc. v. City of Coral Springs, 885 So.2d 912, 914 (Fla. 4th DCA 2004) (internal citations omitted)';' see also Restigouche, Inc. v. Town of Jupiter, 59 F.3d 1208, 1214 (11th Cir.1995). “The rational basis standard is highly deferential ... If the question is at least debatable, there is no substantive due process violation.” WCI Communities, 885 So.2d at 914; see also Gardens Country Club, Inc. v. Palm Beach Cnty., 712 So.2d 398, 404 (Fla. 4th DCA 1998).
Addressing the Bennetts’ facial claim first, we agree with the trial court that the LDC’s “non-residential uses” prohibition is not unconstitutionally ambiguous. • For a law or ordinance to be unconstitutionally ambiguous on its face, the challenger must establish that no set of circumstances exists under which the statute would be valid. Cashatt v. State, 873 So.2d 430, 434 (Fla. 1st DCA 2004) (noting the difficulty of establishing a facial challenge as compared to an as-applied challenge). Here, the County’s restriction and enforcement challenged by the Bennetts relate to specific zoning requirements that are intended to preserve designated residential areas. The Bennetts don’t challenge the constitutionality of having this sort of zoning classification per se, but only that the LDC’s parameter prohibiting “non-residential uses” is too ambiguous to ever be constitutionally applied. But the “non-residential uses” prohibition is not unconstitutional on its face because contexts exist where it “convey[s] a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice.” Marrs v. State, 413 So.2d 774, 775 (Fla. 1st DCA 1982) (internal citation omitted); see also State v. Catalano, 104 So.3d 1069, 1075 (Fla.2012) (“[I]n order to withstand [a vagueness] challenge, a statute must provide persons of common intelligence and understanding adequate notice of the proscribed conduct.”). It is clear, for instance, that the “non-residential uses” prohibition would bar the Bennetts from running a seafood market on their residential lot; or a jet-ski and parasail rental outlet; or a commercial fish packing operation; or a myriad of other commonly recognized commercial or industrial uses. No doubt these uses would be “non-residential” in virtually everyone’s estimation. And so, the LDC’s warning, as applied to certain commercial and industrial activities at least, is sufficiently clear and requires that we uphold the “non-residential uses” restriction against the Bennetts’ facial challenge.
B.
Now, the tougher question in this case is whether the LDC’s prohibition on “non-residential uses” conveys a sufficiently definite warning as applied to the Ben-netts’ particular use of the Lawn — regularly renting it for weddings and other big events. On one hand, people throw parties in their homes in residential neighborhoods all the time. And they often invite lots of people to attend. Folks get mar *389 ried in homes (or on the lawns of homes), hold big birthday celebrations, throw Fourth of July barbecues, Super Bowl and Kentucky Derby parties, host church and civic club-related gatherings, sponsor political receptions, and the like. Common experience doesn’t dictate that these events are inherently “non-residential” at all, or that a prohibition on “non-residential uses” would work a complete ban on large house-party events.
But on the. other hand, this isn’t a case about an occasional residential wedding event. Rather, - the Bennettss regularly rent out their residential lot for weddings and other events many times each year— about 30 times in 2009, 20 times 2011 and 2012, and 13 times in 2010 (after the big oil spill in the Gulf of. Mexico). What’s more, record testimony from the Bennetts’ neighbors indicates that events on the Lawn aren’t simple hours-long events; they can extend for days beginning on a Thursday and running through the- weekend with pre- and post-wedding receptions, dinners, parties, music, and with caterers, tents, chairs, [and portable potties] on their neighborhood lot.- To deal with large numbers of attendees and neighbors, the Bennetts even, hire an off-duty sheriffs deputy to remain on site for the events.
At the heart of the Bennetts’ as-applied challenge is the question of ‘how many weddings and other event are too many for the residential lot?’ The County admits that it doesn’t enforce an outright prohibition on residential weddings and large parties. Nor does it argue that these are inherently “non-residential.” Rather, the frequency and intensity of the Bennetts’ rentals is what drew the ire of neighbors and, in turn, triggered the County’s code enforcement action. The Bennetts downplay the importance of the frequency and intensity of their rentals in viewing the County’s restriction and enforcement as ambiguous and arbitrary. Their position is that if weddings can be held in residential neighborhoods at all, then the Lawn can be freely used to host their renters’ weddings and events too. And they point out that Florida law prohibits discrimination against renters (versus homeowners) with respect to what uses they can make of rental property.
But common understanding dictates that the frequency and intensity of activities on the Bennetts’ property — regardless of whether the lot is being used by the homeowners themselves or their renters — bears heavily upon whether its usage is residential ór non-residential. For instance, it’s commonplace for homeowners to invite and serve dinner to guests. But serving dinner regularly to customers in the mode of a typical. restaurant is not a residential use. Similarly, a family may post a “For Sale” sign in their minivan in the driver way, but offering lots of used cars for sale in a home’s driveway is also , likely to be considered a non-residential use. In both cases, the frequency and intensity of the activities is critical to distinguishing what is a residential from what is a non-residential use.
Likewise in this case, the Bennetts have essentially introduced a wedding venue business into their Residential Preservation Area neighborhood, attracting renters who might otherwise rent meeting halls, parks, churches, country clubs, or destination-wedding resort locales to stage their big events. The rate and scope of the Lawn’s rental usage — up to 30 weddings per year on the Bennetts’ lot — isn’t typical residential usage as measured by common practice. And so, on -the critical wedding/event frequency question, we cannot fault the trial court’s conclusion that “ ‘non-residential uses’ as contained in the [LDC] is sufficiently clear and unambiguous to survive a due process challenge.” *390 The LDC’s “non-residential uses” restriction conveys a clear and sufficient standard as applied to the Bennetts’ many rentals each year.
C.
The second part of the Bennetts’ argument is that the County’s enforcement is unconstitutionally ad hoc and illegitimate. The Bennetts argue that it’s unlawfully arbitrary, for instance, for the County to have cited them without specifying how many weddings the Lawn may host each year under the LDC. They also cite mixed messages from code enforcement officers, which they claim to have rendered the LDC unconstitutional as applied to them.
In our view, the County’s aversion to setting a specific maximum number of weddings doesn’t demonstrate arbitrariness. See Kuvin, 62 So.3d at 632 (“[O]rdi-nances ... enjoy a presumption in favor of constitutionality ... [and] must be upheld unless ... [shown to be] a mere arbitrary exercise of the municipality’s police power.”) In responding to neighbors’ complaints, the County’s basic approach toward the Bennetts was that renting then residential lot for lots of weddings and events violated the LDC. And there’s no question here that renters were holding lots of events on the Lawn, causing friction with neighbors. How many weddings the County might allow in a given year is an interesting question to be sure, but under these facts the County needn’t have set a concrete limit in order to enforce its restriction. See, e.g., Catalano, 104 So.3d at 1076 (“To withstand constitutional scrutiny, ... statutes do not have to set determinate standards or provide mathematical certainty.”) (citing Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (noting mathematical certainty cannot be expected from the use of words); Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (noting.that statutes must set out standards in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest)). The Bennetts’ activity clearly offended the LDC’s prohibition by renting their property for so many weddings and events each year.
Nor do the Bennetts’ other arguments regarding the County’s enforcement merit a declaration of unconstitutionality. County code enforcement officers proposed various ways for compromise between the Bennetts and their neighbors related to noise, curfews, advertising, etc. But-the bottom line with enforcement during the 15-month period cited in the complaint was that the County would not allow the Bennetts to make non-residential use of the Lawn. It repeatedly cited them for holding more weddings and events to the point of fining them for even a single additional event in 2011 (a year in which about 20 events were held on the Lawn). Under these circumstances, the County’s enforcement was not arbitrary or inconsistent with the LDC’s prohibition on nonresidential uses, or the County’s rationally related residential preservation goals. The County’s response also reflected the zoning enforcement expectations of the Bennetts’ neighbors, who complained about all the events and also didn’t think that the lot could play host to so many weddings each year.
II.
For these reasons, we find no error in the result reached in the trial court’s order resolving the parties’ cross motions for partial summary judgment.
AFFIRMED.
*391 WOLF, J., concurs. MAKAR, J., concurs in part, dissents in part, with opinion.