Stephen MEDVIK, Plaintiff/Appellant,

v.

Frank OLLENDORFF,
Defendant/Respondent.

No. 54792.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 18, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 17, 1989.

Application to Transfer Denied
Aug. 1, 1989.

Alan G. Kimbrell, Rosecan & Kimbrell, St. Louis, for plaintiff/appellant.

Shulamith, Simon, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, for defendant/respondent.

SATZ, Judge.

This appeal is before us for the second time. *See Medvik v. Ollendorff,* 727 S.W.2d 473 (Mo.App.1987). Plaintiff, Stephen Medvik (Medvik), was discharged from employment as a mechanic for University City, Missouri (City). He was notified of his termination in a letter from Willie Norfleet (Norfleet), the City's Director of Finance. Procedures established by the City allow an employee to appeal a disciplinary action to the City's Civil Service Board (Board). The Board holds a hearing and makes a recommendation to the City Manager. The City Manager provides the last review at the administrative level.

Medvik appealed his discharge to the Board, the Board recommended a suspension rather than a discharge, the City Manager, Frank Ollendorff (Ollendorff), sustained the discharge, and, on review, the circuit court reversed the discharge and ordered Medvik reinstated. On appeal, we reversed and remanded this cause to the circuit court, directing the court to remand the cause to Ollendorff for him to make Findings of Fact and Conclusions of Law, after reviewing the record and hearing oral argument or receiving written briefs. *Medvik v. Ollendorff, supra,* 727 S.W.2d at 472; §§ 536.080(1), (2), 536.090 RSMo (Supp.1987).

Apparently, the trial court remanded the cause to the Board, which made an identical finding and recommendation. Ollendorff, after following the process dictated by our prior opinion, again concluded Medvik's discharge should be sustained. The circuit court affirmed. We affirm the judgment of the trial court.

Medvik first contends his right to procedural due process was violated in the termination process. More specifically, he contends he was not given proper notice, he was denied his right to confront and cross-examine the witnesses used against him and he was denied the right to present witnesses in his own behalf. We disagree.

The City publishes an "Employees Handbook" which, among other things, sets out work rules, the recommended "Uniform Disciplinary Penalties ... for the Enforcement of General Work Rules" and the appeal "Procedure for Handling Complaints Relating to Discharge." The parties tacitly agree that this Handbook, by requiring cause for discipline and by establishing an appeal procedure, creates a property interest in continuing employment. See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Medvik may not be deprived of this interest without appropriate procedural safeguards. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); *Belton v. Board of Police Comm'rs of Kansas City,* 708 S.W.2d 131, 137[6] (Mo. banc 1986). The Due Process Clause applies, but what process was due?

The City's "Employees Handbook" separates employee actions which constitute offenses into separate Groups and recommends punishment for the first and subsequent offenses in each Group. Apparently, there are four Groups of offenses. The higher the Group number, the more egregious the included offenses. Part of the dispute in this case involved a determination of whether Medvik's actions constituted a Group I or Group II offense. Discharge is recommended for a fourth Group I offense, but it is recommended after only two Group II offenses.[1]

---

1.  GROUP I
    First Offense.... Warning followed by appropriate instruction

Second Offense ... One or two-day suspension, without pay

The suggested discipline or discharge is determined not only by the nature of the current offense and, thus, its classification, but also by the nature of any prior offenses and, thus, their respective classifications and the frequency of those offenses. In sustaining Medvik's discharge, Ollendorff found that Medvik had committed four Group I violations—a current Group I violation and three prior ones. Medvik contends he did not receive proper notice of these charges. We read the record differently.

Medvik's counsel on appeal was not his counsel at the hearing before the Board. Medvik's appellate counsel must take the record as he finds it, and so must we.

In his letter of discharge to Medvik, Norfleet informed Medvik that the letter was "official notification" that Medvik's "employment [would be] terminated ... at the end" of the next working day. The letter also said Medvik's discharge resulted from an incident on March 15, 1985, involving "abusive language" directed to a fellow employee, Thirplis Williams, who is black. Several times during this incident, Medvik used the word "nigger," a derogatory, bigoted epithet. This language could be a Group I, Rule 13 offense—"an incident involving an unwanted or imprudent statement to a co-worker of a ... racial ... nature," or it could be Group II, Rule 20 offense—"... racial ... harassment of a co-worker."

Norfleet's letter also reminded Medvik of a 1983 incident in which he was "disciplined for making offensive remarks to Mr. Richard Kemp" and in which, Norfleet reminded Medvik, he was told: "Should any further incidents occur, your employment status will be reviewed and discharge may result." [2]

At the hearing before the Board, Medvik was represented by counsel. His personnel file was read into the record, without objection. It disclosed the four incidents requiring discipline referred to in Ollendorff's findings—the then current 1985 incident and incidents in 1983, 1981 and 1980. Investigative reports of the City's Affirmative Action Committee concerning possible racial overtones in at least two of these incidents were also read into the record, without objection. Moreover, Medvik's counsel questioned the City's Affirmative Action Officer as well as Norfleet. Based upon this record, the Board, in its Findings of Fact, said it "did not believe the [1985] incident resulting in the discharge amounted to a Group II, Rule XIII, Racial Harrassment (sic). ..."; rather, the Board characterized Medvik's conduct as "Abusive Language of a Racial Nature," a Group I violation. Ollendorff also found the 1985 incident to be a Group I violation, and he found three prior incidents in 1983, 1981 and 1980, for which Medvik had been disciplined, were Group I violations.

■ Medvik contends Norfleet's letter did not notify him he was being charged

---

Third Offense.... Five-day suspension, without pay

Fourth Offense ... Discharge

Note: Consideration may be given to the severity of the offense, the cost involved, the time interval between offenses, the length and quality of service record, and the ability of the employee concerned. In each case where the penalty deviates from the recommended standard penalties, the reasons for such deviation will be noted.

1. ....

....

20. An incident involving an unwanted or imprudent statement to a co-worker of a sexual, racial, ethnic or religious nature.

GROUP II

First Offense.... Two-day suspension without pay followed by appropriate instruction

Second Offense ... Discharge

. . . . .

1. ....

....

13. Sexual, racial, ethnic or religious harassment of a co-worker.

2. Medvik was also informed he had "an opportunity to make any statements or repeat [his] story to [Norfleet] at this time...." Norfleet's report of this incident indicates he spoke with Medvik while investigating it. Medvik does not specifically contend that he was not given proper pre-termination notice. *See, e.g., Belton v. Board of Police Comm'rs of Kansas City, supra,* 708 S.W.2d at 838.

with the four Group I violations upon which Ollendorff sustained Medvik's discharge. The letter, Medvik argues, notified him of only two violations—the then current 1985 incident and a 1983 incident, neither of which was classified by Group. Moreover, Medvik argues, the hearing before the Board did not cure the error of improper notice; rather, he argues the hearing before the Board compounded the error because during the hearing Norfleet characterized the 1985 incident as a Group II violation, not a Group I.

Medvik's view of Norfleet's letter is too narrow. The notice given by that letter in this administrative proceeding need not meet the precision required by a criminal or, even, a civil judicial proceeding. *See, e.g. State ex rel. Powell v. Wallace*, 718 S.W.2d 545, 548[2] (Mo.App.1986); *Sorbello v. City of Maplewood*, 610 S.W.2d 375, 376[1] (Mo.App.1980). Medvik simply needed to be fairly apprised of the grounds upon which his discharge was sought. *Id.* Norfleet's letter not only specifically pointed out the 1985 and 1983 incidents but also specifically reminded Medvik of the warning given him at the time of the 1983 violation—"Should any further incidents occur, *your employment status will be reviewed* and discharge may result" (emphasis added). Sensibly read, this is warning enough that Medvik's entire employment would be reviewed. Medvik was no neophyte naively lost in a procedural maze; nor does the record indicate the counsel Medvik retained was a new boy on the block. More important, perhaps, at the hearing before the Board, Medvik's counsel made no objection to or inquiry about Medvik's prior violations and the accompanying disciplinary actions which were read into the record by Norfleet.

Admittedly, when asked whether he was basing Medvik's discharge on a Group II offense, Norfleet answered: "That's correct." [3] But, Norfleet also said he was not basing his "judgment on one incident." He was "basing it on the continuation of several incidents and several problems consistently with ... Medvik." He went on:

"It's just that this last incident demanded action and I took action. And it's not a hasty move on my behalf. It's after careful consideration of the employee, looking at the history, I feel that it's in the best interest of the City to terminate that employee."

Learning this, Medvik's counsel could not help from knowing it was Medvik's prior violations, precisely laid out before the Board, which were the grounds for his discharge. This was adequate notice to Medvik.

■ If not adequate notice, then, the unquestioning acceptance by Medvik's counsel of the City's proof of Medvik's prior violations constitutes a waiver of that notice. Admittedly, a waiver is the intentional relinquishment of a known right. *E.g. Shapiro v. Shapiro*, 701 S.W.2d 205, 206[2] (Mo.App.1985). And, that intent is never lightly inferred, see, *Dunn v. Pickard*, 284 S.W.2d 6, 9[2] (Mo.App.1955), particularly, when, as here, the right in issue is a constitutional right. *See, e.g. Klein v. Harris*, 667 F.2d 274, 288[19] (2d Cir.1981). But, this reluctance to find a waiver stems from the basic reason for the existence of the right to notice: simple fairness. We have carefully read the record here. On the present facts, Medvik was fairly notified of the charges against him.

Medvik also contends he was denied the right to confront and cross-examine the witnesses against him. More specifically, he argues "the City did not call a single witness who had personal knowledge" of the charges on which Ollendorff relied, and he argues there is no indication the Board had subpoena power which he could invoke to call witnesses.

---

3. The precise colloquy was:
   [Board Member]: I'm looking at the Employee's Handbook. Are you basing the discharge on his Group II offense? Is that correct? Norfleet: That's correct.
   [Board Member]: Now, my question there is on the first offense in Group II this calls for a two day suspension without pay. The attempt (sic) would have been the incident with Mr. Kemp back in June of (1983) but I don't believe that action was taken then. He was demoted.
   Norfleet: That's correct.

We do not operate in a vacuum. We, obviously, must limit our review to the record before us. Medvik's counsel made no objection to any of the evidence adduced. This evidence is, therefore, competent, *see, e.g., Mark Twain Homes v. Labor and Indust. Rel. Comm'n.,* 616 S.W.2d 145, 147[1, 2] (Mo.App.1981), and, from our review, we find it sufficient to support Ollendorff's findings. *Id.* We have read the cases Medvik cites to attack the weight given to hearsay evidence. They are distinguishable.

Moreover, we are not persuaded by Medvik's complaint about the Board's possible lack of subpoena power. Medvik never requested the Board to aid him in producing witnesses and, thus, never demonstrated to the Board, to Ollendorff or to us the prejudice worked against Medvik because these unnamed witnesses did not appear.

Medvik also complains that Ollendorff made his own findings without hearing evidence and without an opportunity to evaluate the credibility of witnesses. This procedure, Medvik argues, made the hearing before the Board a nullity and denied him the right to rebut testimony by presenting witnesses in his own behalf before Ollendorff.

Ollendorff was the final decision maker. He based his decision on his reading the transcript of the proceedings before the Board and on his review of the Board's findings and recommendations. Moreover, Medvik was given an opportunity to file a written brief or make an oral argument before Ollendorff. This procedure is neither unusual or contrary to approved administrative proceedings. § 536.080.2 RSMo 1986; *see e.g. Ferrario v. Bear,* 745 S.W.2d 193, 197–198[6] (Mo.App.1987); *Bell v. Gen'l Motors Assembly Div.,* 742 S.W.2d

225, 226[3] (Mo.App.1987). Medvik's real complaint is that Ollendorff classified Medvik's violations. Those violations were uncontested and, thus, Ollendorff's classification of them as being within the offenses defined by Group I—the least egregious of the classified offenses—worked no prejudice against Medvik.

The procedural process due in an administrative hearing is less than that required by a full trial. *Boyd v. Civil Service Comm'r of City of St. Louis,* 657 S.W.2d 83, 86[4] (Mo.App.1983). Within proper administrative limits, Medvik was entitled to notice of the charges against him, presentation of the evidence against him and an opportunity to present his side of the story. *E.g. Belton v. Board of Police Comm'rs, supra,* 708 S.W.2d at 137. The specific dictates of this due process are determined by balancing Medvik's property interest, the risk of erroneously depriving him of that interest through the procedure used, and the City's interest in quickly removing an unsatisfactory employee. *Id.* Medvik was given the process required by this balance. We find no need to judicialize this process more.[4]

Medvik also contends his right to due process was violated because the conduct prohibited by Group I, Rule 20, one of the grounds of his discharge, is too vaguely defined and, therefore, does not pass constitutional muster. We disagree.

[A] statute which either forbids or requires [conduct] in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. . . .

*Ferguson Police Officers Ass'n. v. City of Ferguson,* 670 S.W.2d 921, 927 (Mo. App.1984).

Additionally, we note that an administrative body's decision is presumptively valid, and we do not interfere with the administrative discretion exercised in reaching that decision, *see, e.g. St. Louis County Police Officers Union v. Gregory,* 622 S.W.2d 713 (Mo.App.1981); nor do we substitute our judgment for that of the administrative body. *See, e.g., Heitzler v. Eppenberger,* 596 S.W.2d 458 (Mo.App.1980).

---

**4.** In a separate point, Medvik makes an additional attack on Ollendorff's Findings. If not repetitious, this argument is interrelated with Medvik's prior attack on Ollendorff's Findings. Medvik contends Ollendorff's "decision is not supported by competent or substantial evidence [because there] was not competent evidence that [Medvik] was guilty of three prior Group I offenses." We have disposed of this contention.

This "void for vagueness doctrine" is applicable to civil as well as criminal cases. *Id.* The doctrine serves two purposes. It ensures that the person of ordinary intelligence is given a reasonable opportunity to know what is prohibited, so that he may act accordingly. It also protects against arbitrary and discriminatory enforcement by ensuring that laws provide explicit standards for those who apply them. *State ex rel. Cook v. Saynes*, 713 S.W.2d 258, 260 (Mo. banc 1986).

Rule 20 authorized sanctions against Medvik for "an unwanted or imprudent statement ... to a co-worker of a sexual, racial, ethnic or religious nature." Medvik contends these words do not give him "reasonable opportunity to know what it prohibited." For example, he argues, one can imagine a joke or comment touching on race or gender that would be offensive only to a sensitive hearer. Contrary to the speaker's expectations, he contends, such a statement could be deemed "unwanted" or "imprudent" and, thus, a Rule 20 violation. Therefore, he concludes, the rule is "so vague that its enforcement cannot help but result in arbitrary and capricious restrictions upon employees' freedom of speech." We disagree.

Medvik's argument is misdirected and forced. We are not required to determine whether the Rule could conceivably be enforced in a discriminatory manner. It will pass constitutional muster if it is susceptible to a reasonable construction supporting its constitutionality. *Bell v. Board of Education of City of St. Louis*, 711 S.W.2d 950, 953 (Mo.App.1986).

Admittedly, the vagueness doctrine may require greater precision in drafting regulations affecting free speech than those affecting other conduct. *Ferguson Police, supra* at 927. A rule designed to prevent inflammatory and disruptive statements, however, necessarily involves some inherent uncertainty. Other than a litany of selected terms, an alternate definition that provides a bright line between permissible and impermissible speech in the work place is not readily apparent. It is necessary that a person subject to the rule be able to make some judgment whether his statement is prohibited. *Ferguson Police, supra* at 927. At this stage of civilized history, persons of normal intelligence are capable of determining whether a racial remark is "unwanted" or "imprudent." We do not believe the guarantee of due process requires the City to define these terms with "mathematical precision." *Saynes, supra* at 261. Rule 20 is not void for vagueness.

■ Medvik makes a similar argument in asserting Rule 20 is impermissibly overbroad. Under the Rule, he contends, "a University City employee may be fired for upholding Professor Shockley's views, in the presence of a black co-worker, that whites have higher IQ's, for criticizing 'women drivers' to a female co-worker, or for denying the divinity of Christ in the hearing of a Christian co-worker." Because Rule 20 prohibits constitutionally protected speech, plaintiff contends, it is facially invalid. Again, we disagree.

The overbreadth doctrine does not require invalidation of the prohibition unless it is "substantially overbroad" and not fairly susceptible to a construction that would limit its applicability to a constitutionally permissible scope. *Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987). We need not and do not construe Rule 20 as broadly as does Medvik. See *Christian v. City of Kansas City*, 710 S.W.2d 11, 14 (Mo.App.1986); *State v. Swoboda*, 658 S.W.2d 24, 25 (Mo. banc 1983). As an employer, the government has an interest in maintaining an orderly work place, which may include removal of disruptive employees who tend to impair efficiency. See *Connick v. Myers*, 461 U.S. 138, 150–51, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983). To serve this interest, Rule 20 prohibits statements "to a co-worker" of a racial nature that are "unwanted or imprudent." Sensibly read, this language does not seek to deter harmless jokes or statements on social or political issues; rather, it is properly designed to prohibit well known pejoratives unacceptable in the work place.

Given this sensible construction, we conclude, Rule 20 is not "substantially overbroad." See *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973); *Gooding v. Wilson,* 405 U.S. 518, 523, 92 S.Ct. 1103, 1106–7, 31 L.Ed.2d 408 (1972). Conceivably, it may be susceptible to an improper application. It is unnecessary, however, to find it facially invalid because an employee's arguably protected speech may be reached or chilled by the rule. *Broadrick, supra* 413 U.S. at 618, 93 S.Ct. at 2919. The Rule was designed to deter the kind of statements made by Medvik. This Court has said:

> Where there are a substantial number of situations to which the statute or regulation might validly apply, we will not strike down the provisions for overbreadth.... If the rights of persons on the edge of the regulation's applicability will be infringed, it will be for them to make the challenge in a concrete dispute.

*Ferguson Police, supra* at 929.

Medvik cites *State v. Swoboda,* 658 S.W.2d 24 (Mo. banc 1983), which struck down a state peace disturbance statute as overbroad. *Swoboda* is not controlling here.

Criminal statutes, as in *Swoboda,* must be scrutinized for overbreadth with particular care. *E.g., City of Houston v. Hill,* 482 U.S. 451, 459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987). Rule 20, in issue here, is not a criminal statute applied to a member of the general public. It is an administrative regulation applicable only to municipal employees for comments made to co-workers in the work place. Implicit in our prior decisions is the unarticulated principle that, as an employer, a government entity may regulate speech among its employees under rules that may be overbroad if applied to the public in general. See, e.g., *Fitzgerald v. Nations,* 610 S.W.2d 48 (Mo. App.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981).

■ Medvik also contends his First Amendment rights were violated because the City failed to show his calling a coworker "nigger" impaired Medvik's ability

to perform or interfered with the efficiency of the work place.

To determine whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2897 [97 L.Ed.2d 315] (1987), quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35 [20 L.Ed.2d 811] (1968).

The *Pickering* balance need not be applied where the employee's statement does not deal with a matter of public concern. See *Rankin, supra,* 483 U.S. at 382–86, 107 S.Ct. at 2896–97. Quite simply, the use of a racial epithet in addressing a co-worker does not constitute a comment on a matter of public concern. If the employee's speech does not involve a matter of public concern, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers, supra,* 461 U.S. at 146, 103 S.Ct. at 1690 (1983).

■ Even where the balancing test applies, however, the government employer's interest in regulating the speech is greater when the statement may be presumed to have impeded the employee's performance or interfered with the regular operation of the work place. See *Pickering, supra,* 391 U.S. at 572–73, 88 S.Ct. at 1737. We can hardly imagine a statement more likely to disrupt the work place than the use of the uniquely ugly and inflammatory epithet employed repeatedly by Medvik. The City was not obliged to make a special showing to demonstrate the disruptive impact of these remarks. This court has held that the First Amendment does not protect a public employee from the consequences, including discharge, of making a "vitriolic personal attack" on another in the work place. *Fitzgerald, supra* at 50. Nor does the First Amendment shield Medvik, a mu-

nicipal employee, from sanctions for racial slurs directed to fellow employees.

Judgment affirmed.

SMITH, P.J., and STEPHAN, J., concur.