Donald D. SNYDER, Respondent,

v.

**DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION,** Appellant.

No. WD 53288.

Missouri Court of Appeals, Western District.

Sept. 23, 1997.

Jeremiah W. (Jay) Nixon, Atty. Gen., Edwin H. Steinmann, Jr., Asst. Atty. Gen., Jefferson City, for appellant.

Lori J. Levine, Carson & Coil, Jefferson City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

ELLIS, Presiding Judge.

Donald D. Snyder was employed as a Chapter 1 Supervisor by the Missouri Department of Elementary and Secondary Education ("the Department") on July 1, 1972. On June 1, 1983, he was made the Director of the Chapter 1 Section. Snyder remained in that position until he was dismissed by the Department on August 12, 1994. Following a hearing, Snyder's termination was affirmed by the Commissioner of Education. This decision was reversed by the Circuit Court of Cole County. The Department appeals from that decision.

Jill Distler began working for Snyder in 1972 and became his personal secretary in 1983. For several years thereafter, a good working relationship existed between Snyder and Distler.[1] Distler considered Snyder to be a "good friend" and a "father figure" with whom she discussed her personal relationships and problems.

In July, 1989, the Department scheduled an annual "clean-up day," during which staff members were to review items stored in the basement of the Department office building and dispose of items no longer needed. In preparation for the clean-up day, Snyder instructed Betty Morff, a Program Specialist in the Chapter 1 Section, not to enter the basement until he and Distler were finished cleaning. While alone with Distler in the basement, Snyder asked Distler for a hug, and she refused.

After Distler refused to hug Snyder in the basement, he became cold and less communicative with her. In October, 1989, Distler attempted to discuss this change with Snyder. They talked for a long time, and while never indicating why his mood had changed, at some point Snyder said, "Well, let's have a hug." Snyder and Distler then hugged. During this hug, Snyder stuck his hands

---

**1.** Snyder would greet Distler when she arrived in the morning and say "goodnight" when she went home. He used her first name in communications with her and routinely used "please" and "thank you." Snyder would also routinely inform Distler of his daily schedule.

under the back of Distler's sweater and kept them there, resting on her shirt, for a couple of seconds.

Over the years, Snyder had given Distler presents which were unlike presents he gave to other staff members (ie. perfume, cologne, jewelry, purses, sweaters, a duffel bag, a musical butterfly, and cut glass bowls). On December 22, 1989, Snyder presented Distler with a Christmas basket filled with various items of Giorgio perfume or cologne. Snyder indicated that, before Distler could receive the gift, he needed "that Christmas hug." Snyder came around his desk, and the two hugged. During this "hug," Snyder pressed his lips against Distler's, and he stuck his hands under her sweater to her bare skin and up to the side of her breast. Distler pushed Snyder away and asked, "Why did you do that?" She then left Snyder's office visibly upset and crying.

On December 29, 1989, Distler contacted Otis Baker, Assistant Commissioner for the Division of Instruction, and told him that Snyder had asked for a hug and something more had transpired. Distler also told Baker about the basement incident. When Baker asked whether she wanted to file a formal complaint, Distler stated that she preferred to see if the situation could be worked out and a better relationship established.

After the Christmas incident, Snyder's behavior toward Distler changed negatively. Several weeks after the incident, Distler informed Baker of several behaviors of Snyder which she considered intimidating and which were distressing her, including: staring or glaring at her frequently, demanding to know where she had been after brief absences from her desk, following her around the office, and writing inaccurate notes about her performance and leaving them in clear view.

In July, 1990, Distler also complained about Snyder's coldness toward her to Stephen Barr, Coordinator for State Programs, and Tom Odneal, Coordinator for Federal Programs. Distler told Barr that Snyder was ignoring her, would pass her in the morning without saying hello, and would only talk to her in a short, abbreviated style for business purposes.

On July 11, 1990, Snyder called Distler into his office. Snyder indicated that he had seen Dawn Hake, a co-worker, follow Distler into the restroom and told Distler that it was none of Hake's business what was going on in his office. Snyder then made reference to wiping the slate clean and throwing away the notes on Distler's performance if she would give him a hug. Distler refused and left the office upset and crying.

Ms. Morff observed this incident and reported it to Baker, who then reviewed the various allegations with Snyder. After Snyder denied the allegations, Baker instructed Snyder to: (1) begin immediately to conduct himself in a manner which is above reproach and to avoid any situation which might give credence to further allegations; (2) refrain from having any secretary in his office with the door closed; (3) refrain from being alone on the premises with any secretary; (4) refrain from making any suggestions to any secretary which might reasonably be construed as advances; (5) refrain from giving gifts to any female employees; and (6) interact with all secretaries in a business-like, but amicable way, avoiding any hint of intimidation. Baker told Snyder that if he was unable to comply with these guidelines termination proceedings would be instituted.

On July 8, 1994, Distler went to Snyder's office to discuss what she viewed as an excessive workload. She also discussed the fact that Snyder did not say "please" or "thank you" often enough. Snyder apologized and said he would try to do better. As Distler left the office, Snyder asked, "At least, can I pat your back?" Snyder then proceeded to pat her on the back.

On July 11, 1994, Distler again met with Snyder in his office to discuss his continued failure to use the terms "please" and "thank you." Snyder again apologized. He stated that they would both have to work on having a good working relationship and that "it works both ways." Snyder then asked, "So can we hug and make up now?" Distler refused to hug Snyder and left his office crying.

Following this incident, Distler spoke with Diane Vaughan, the Administrative Assistant to the Commissioner of Education. Distler

told Vaughan about the recent incident and about Snyder's behavior over the previous four years. Vaughan told Distler she would call the Commissioner and that there would be an investigation.

On July 14, 1994, Baker sent Snyder a letter informing him of the complaints against him and suspending him with pay during the course of an investigation of those charges. Following that investigation, on August 2, 1994, Baker sent a letter to Snyder setting out the actions for which he was being disciplined and terminating Snyder's employment with the Department. The letter advised Snyder that he was being fired for violation of Personnel Policy 8–2G1.C which states in pertinent part:

1. Disciplinary action shall be appropriate for, but not limited to, the following causes, namely that an employee:

C. Has been guilty of abusive or improper treatment toward a ... Department employee including, but not limited to discrimination or harassment based upon race, age, sex ...

Pursuant to the Department's personnel policy, Snyder filed a grievance challenging his dismissal. On February 9, 1995, the cause was heard by Dr. Russell McCampbell, the Commissioner of Education's designated hearing officer. On June 30, 1995, the Commissioner of Education entered his Findings of Fact and Conclusions of Law, affirming Snyder's dismissal. Snyder eventually appealed to the Circuit Court of Cole County. On August 2, 1996, the court issued its Findings of Fact and Conclusions of Law, reversing the Commissioner's decision and ordering that Snyder be reinstated with back pay. The Department brings two points on appeal.

■ In its first point on appeal, the Department asserts that the circuit court lacked jurisdiction to review the Commissioner's decision. The Department claims that Snyder, as a nonmerit employee, is not afforded the right to appeal to the circuit court under § 36.390.[2]

■ The facts pertaining to this issue are not in dispute, leaving merely a question of statutory construction. Statutory construction is a question of law, and therefore, our review is *de novo*. *Delta Air Lines, Inc. v. Director of Revenue*, 908 S.W.2d 353, 355 (Mo. banc 1995). When considering statutory construction, our primary responsibility is to ascertain the intent of the general assembly from the language used and to give effect to that intent. *Laws v. Secretary of State*, 895 S.W.2d 43, 46 (Mo.App. W.D.1995).

There are two categories of Missouri state agency employees, merit and non-merit. Those agencies listed in § 36.030.1 are designated "merit" agencies, which means, *inter alia*, that regular employees of those agencies have a right of appeal to the Personnel Advisory Board if they are dismissed, suspended for more than five days, or involuntarily demoted. § 36.390.5; *State ex rel. Lohman v. Personnel Advisory Bd.*, 948 S.W.2d 701, 703 (Mo.App. W.D.1997). Agencies not listed in § 36.030.1 are considered "non-merit" agencies. The parties concede that the Department is a non-merit agency and, consequently, that Snyder is a non-merit employee. With regard to merit employees, § 36.390.5 provides:

Any regular employee who is dismissed ... may appeal in writing to the board within thirty days after the effective date thereof, setting forth in substance his reasons for claiming that the dismissal ... was for political, religious, or racial reasons, or not for the good of the service. Upon such appeal, both the appealing employee and the appointing authority whose action is reviewed shall have the right to be heard and to present evidence at a hearing which, at the request of the appealing employee, shall be public.... After the hearing and consideration of the evidence for and against a dismissal, the board shall approve or disapprove such action ...

§ 36.390.5. Nonmerit agencies may adopt the provisions for appeals provided in subsection 5. § 36.390.7.[3] "Agencies not adopting the

2. All statutory references are to RSMo.1994 unless otherwise noted.

3. Section 36.390.7 provides:

The provisions for appeals provided in subsection 5 for dismissals of regular merit employees may be adopted by nonmerit agencies of

provisions for appeals provided in subsection 5 shall adopt dismissal procedures substantially similar to those provided for merit employees." § 36.390.8.[4] Finally, § 36.390.9 states:

> The hearing shall be deemed to be a contested case and the procedures applicable to the processing of such hearings and determinations shall be those established by chapter 536, RSMo. Decisions of the personnel advisory board shall be final and binding subject to appeal by either party. Final decisions of the personnel advisory board under this subsection shall be subject to review on the record by the administrative hearing commission or by the circuit court pursuant to chapter 536, RSMo, but not both, at the election of the appealing party.

§ 36.390.9.[5]

 The Department contends that since § 36.390.9 states only that decisions of the Personnel Advisory Board (PAB) are appealable, the statute by implication excludes appeals from decisions by the Commissioner. Such is not the case. When interpreting statutes, we must view a statutory provision in light of the entire legislative act, harmonizing all provisions if possible. *Missouri Hosp. Ass'n v. Air Conservation Comm'n*, 874 S.W.2d 380, 397 (Mo.App. W.D. 1994). In addition, we presume the legislature did not intend an absurd or unreasonable result. *State v. Moriarty*, 914 S.W.2d 416, 423 (Mo.App. W.D.1996). Were we to adopt the Department's construction, we would be disregarding both of the foregoing maxims of statutory construction. It would not be a harmonious interpretation of the

entire stature and it would lead to an absurd result. Section 36.390.7 provides that the *"provisions for appeals provided in subsection 5 for dismissals of regular merit employees may be adopted by nonmerit agencies ... for any or all employees of such agencies."* § 36.390.7 (emphasis added). Section 36.390.8 requires that agencies not adopting the *"provisions for appeals provided in subsection 5 shall adopt dismissal procedures substantially similar to those provided for merit employees."* § 36.390.8 (emphasis added). Thus, both merit employees and non-merit employees of agencies adopting the provisions of subsection 5 are clearly afforded the right to appeal from a decision of the Personnel Advisory Board. § 36.390.9. In order for the Department's dismissal procedures to be substantially similar to those provided to merit employees, as required by § 36.390.8, those procedures must allow for an appeal from the Commissioner's decision.

Moreover, under § 36.390.9, the hearing before the Commissioner is deemed to be a contested case,[6] and the procedures of chapter 536 applicable to the processing of such hearings and determinations are to be followed. § 36.390.9. Within chapter 536, section 536.100 provides that "[a]ny person who has exhausted all administrative remedies provided by law and who is aggrieved by a final decision in a contested case ... shall be entitled to judicial review thereof, as provided in sections 536.100 to 536.140, unless some other provision for judicial review is provided by statute." § 536.100. Accordingly, Snyder was entitled to judicial review of the Commissioner's decision.

---

the state for any or all employees of such agencies.

**4.** "[T]he clear intent of subsections (7) and (8), when read together, is that an agency must adopt its own procedures for appeal under subsection (8) or else it will be subject to subsection 36.390(5)'s procedures for merit employees as if it had adopted them." *Laws v. Secretary of State*, 895 S.W.2d 43, 46 (Mo.App. W.D.1995).

**5.** In *Asbury v. Lombardi*, 846 S.W.2d 196 (Mo. banc 1993), the Missouri Supreme Court held § 36.390.9 was "unconstitutional to the extent that it may be construed to preclude judicial review or to preclude direct judicial review of a

final agency decision." *Asbury*, 846 S.W.2d at 202.

**6.** The Department argues that in "deeming" the hearing to be a contested case, the legislature did not mean to make such hearings contested cases. In ascertaining the intent of the legislature, undefined words are given their plain and ordinary meaning as found in the dictionary. *Asbury v. Lombardi*, 846 S.W.2d 196, 201 (Mo. banc 1993). The dictionary defines "deem" as "to hold; consider; adjudge; believe; condemn; determine; treat as if; construe." Black's Law Dictionary 374 (5th ed.1979). Under any of these definitions, section § 36.390.9 requires that Snyder's hearing at least be treated like a contested case.

The Department argues our conclusion is contrary to this court's decision in *Cole v. Conservation Commission,* 884 S.W.2d 18 (Mo.App. W.D.1994). In *Cole,* a conservation agent was terminated as a result of an altercation with a student at Central Methodist College. The Conservation Commission is a non-merit agency and Cole was a non-merit employee. After exhausting the grievance procedure established by his employer, Cole sought judicial review of his termination. This court held that Cole was a common law employee-at-will who could be terminated at any time for any reason and, as such, was not entitled to judicial review under § 536.150. *Id.* at 20. However, the effect of subsections (7), (8) and (9) of § 36.390 was neither raised nor decided by the court in *Cole.* Nevertheless, the *Cole* court did recognize that judicial review is available to a terminated employee-at-will if "the employee is protected by statute, ordinance, regulation or employment contract." *Id.* As noted *supra,* subsequent to our ruling in *Cole,* this court decided *Laws v. Secretary of State,* 895 S.W.2d 43 (Mo.App. W.D.1995). In *Laws,* we held that "the clear intent of subsections (7) and (8) [of § 36.390], when read together, is that an agency must adopt its own procedures for appeal under subsection (8) or else it will be subject to subsection 36.390(5)'s procedures for merit employees as if it had adopted them." *Id.* at 46. Thus, *Laws* found that non-merit employees have a statutory right to appeal, and it naturally follows, that if such employees have the same or substantially similar rights as those provided by § 36.390.5 for merit employees, they likewise have the same right to judicial review as provided in § 36.390.9. While we believe the general holding of *Cole* is consistent with our decision in *Laws* and the conclusion we reach here, to the extent that it is in conflict, it should no longer be followed.

■ The Department next claims that, even if § 36.390 allows for review by the circuit court, that review is limited to determining whether Snyder was afforded a dismissal review procedure substantially similar to the procedures applicable to contested cases in Chapter 536. However, the scope of the circuit court's review is clearly set out in § 536.140 and allows the court to determine whether the action of the agency: (1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the record as a whole; (4) is, for any reason, unauthorized by law; (5) is made upon unlawful procedure or without fair trial; (6) is arbitrary, capricious or unreasonable; (7) involves an abuse of discretion. § 536.140.2.[7] Point denied.

■ In its second point, the Department claims the circuit court erred in finding the Department was required to establish that Snyder's conduct was actionable under Title VII as sexual harassment in order to discharge him. The circuit court found that "the termination letter sent to Snyder, states that he was terminated for violating Personnel Policy 8–2G1.C because he was guilty of sexual harassment." Because the Department policy did not contain a definition of "sexual harassment," the court determined that Title VII standards should apply and that the facts were insufficient to support a Title VII claim.

■ Initially, we observe that the trial court's finding on this issue is irrelevant. On appeal, we review the decision of the Commissioner, not the decision of the circuit court. *Division of Family Servs. v. Cade,* 939 S.W.2d 546, 550 (Mo.App. W.D.1997) (citing *McCall v. Goldbaum,* 863 S.W.2d 640, 642 (Mo.App. E.D.1993)). In so doing, we give great deference to the decisions of the Commissioner on questions of fact and will not substitute our judgment for that of the Commissioner unless his action exceeds his authority; is not based on substantial and competent evidence on the record as a whole; is unreasonable, arbitrary or capricious; involves an abuse of discretion; or is otherwise unlawful. *Cade,* 939 S.W.2d at 550. Howev-

---

7. "The scope of judicial review in all contested cases, whether or not subject to judicial review pursuant to sections 536.100 to 536.140, and in all cases in which judicial review of decisions of administrative officers or bodies ... shall in all cases be at least as broad as the scope of judicial review provided for in this subsection." § 536.140.2.

er, "[w]here an administrative decision is clearly based upon the agency's interpretation or application of the law, the administrative conclusions of law and decision based thereon are matters for the independent judgment of the reviewing court." *Jenkins v. Bryles*, 802 S.W.2d 177, 182 (Mo.App. S.D. 1991).

Following Snyder's termination hearing, the Commissioner found that Snyder violated Personnel Policy 8–2G1.C by requesting hugs from Distler and touching her inappropriately from July 1, 1989 to July 1994, and that upon her rejection of his advances, Snyder treated her in a cold and unfriendly manner. Upon that finding, the Commissioner affirmed Snyder's dismissal. Neither the Department nor the Commissioner ever determined that Snyder's conduct constituted "sexual harassment" or stated that he was being fired for "sexual harassment." Snyder's dismissal was not based on a violation of Title VII, and the Department was not required to prove that Snyder had "sexually harassed" Distler in violation of that title in order to terminate his employment.[8]

As noted, the Commissioner found, from substantial and competent evidence, that Snyder had requested hugs from Distler and touched her inappropriately over the period of July 1, 1989 to July, 1994, and that upon her rejection of his advances, Snyder had treated her in a cold and unfriendly manner. The Commissioner determined that this behavior violated Personnel Policy 8–2G1.C and upheld Snyder's termination on that basis. Personnel Policy 8–2G1.C states:

> In general, most employee/employer problems can be resolved with a reasonable amount of positive supervision and counseling. Disciplinary action, when required, must be based on factual considerations and be appropriate in view of the severity of the problem.

1. Disciplinary action shall be appropriate for, but not limited to, the following causes, namely, that an employee:

\* \* \* \* \* \*

C. ***Has been guilty of abusive or improper treatment toward a*** student, client, claimant, patron or ***Department employee*** including, but not limited to discrimination or harassment based upon race, age, sex, religion, national origin, ancestry, veteran status or disability. (emphasis added).

Given the facts of this case, the Commissioner was well within his discretion to determine that Snyder's treatment of Distler was abusive or improper and in violation of Personnel Policy 8–2G1.C.

■ Snyder argues, however, and the Circuit Court agreed, that evidence of conduct prior to July, 1994 should be completely disregarded. The Circuit Court found that Snyder's behavior in 1989 had been "reported, considered, and disposed of" by the Department and that "[f]urther action thereon is effectively *res judicata.*" The Circuit Court further held that the evidence of Snyder's conduct prior to July of 1994 could not be considered because it occurred beyond the statute of limitations for Distler to pursue a civil remedy under Title VII.

■ As noted, *supra,* this was not an action under Title VII, and therefore, the statute of limitations applicable thereto does not apply. Furthermore, the manner in which the Department "disposed of" the 1989 matter was to officially warn Snyder that any further improper behavior could result in his dismissal. A prior warning by an employer does not act as *res judicata* to bar consideration of the prior acts in future disciplinary actions and may well make the consideration of such evidence even more appropriate. *See Medvik v. Ollendorff,* 772 S.W.2d 696 (Mo. App. E.D.1989).[9]

■ Moreover, even were we to agree that Snyder's acts in 1989 could not now be

---

**8.** The standards of Title VII simply do not apply. The circuit court misconstrued the termination letter sent to Snyder. While the letter does state that Distler accused Snyder of conduct she considered "sexual harassment," the letter does not state that he was being fired for "sexual harassment." After setting forth Distler's accusations, the letter proceeds to set out the facts uncovered by the Department's investigation and to advise

Snyder that he was being terminated for abusive or improper treatment of a Department employee in violation of Personnel Policy 8–2G1.C.

**9.** In *Medvik,* a termination hearing was held because Medvik, a city employee, used "abusive language of a racial nature" toward a fellow employee in 1985. *Medvik* held that the city's Civil Service Board properly considered evidence

acted upon by the Commissioner, those facts are clearly relevant to understanding the implications of his actions and statements in 1994. "Evidence is relevant if it tends to prove or disprove a fact in issue or corroborates other relevant evidence." *Kennedy v. Milligan*, 915 S.W.2d 784, 792 (Mo.App. W.D. 1996). In 1994, after Distler expressed concern about her work load and requested that Snyder act in a more civil manner toward her, Snyder asked if he could at least pat her back. Three days later, following a similar discussion, Snyder told Distler, "It works both ways," and then asked, "So can we hug and make up now?" In considering whether these comments constituted improper or abusive treatment of Distler, the Commissioner was entitled to consider that similar requests had resulted in Snyder groping Distler in the past.

The Commissioner did not err in affirming Snyder's dismissal. Accordingly, the judgment of the circuit court is reversed and the case remanded. The Circuit Court is directed to enter judgment affirming the decision of the Commissioner.

All concur.

of three similar incidents which had occurred in 1980, 1981, and 1983 in reaching its determination to terminate Medvik even though the first two events were not referenced in his termination letter. *Medvik v. Ollendorff*, 772 S.W.2d 696, 699 (Mo.App. E.D.1989). This evidence was made even more appropriate by the fact that after the 1983 incident, Medvik was warned, "Should any further incidents occur, your employment status will be reviewed and discharge may result." *Id. See also City of Jennings v. Division of Employment Sec.*, 943 S.W.2d 330 (Mo.App. E.D.1997).