

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| MELVIN DIGGS, | ) | No. ED108521 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Cause No. 1822-CC03958 |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | Honorable Michael F. Stelzer |
| | ) | |
| Respondents. | ) | Filed: November 24, 2020 |

## Introduction

Melvin Diggs (Diggs) appeals the judgment of the trial court, which affirmed the decision of the Civil Service Commission (Commission) upholding Diggs' termination from employment as a Correctional Shift Supervisor for the Division of Corrections, due to a violation of the Division's Policy on Workplace Violence. Diggs argues that the Commission's decision is unsupported by competent and substantial evidence, that the pre-termination hearing violated due process, and that the regulation is unconstitutional on its face and as applied to Diggs. We affirm.

## Background

The evidence before the Commission was as follows. Diggs worked for the City of St. Louis Department of Public Safety, Division of Corrections, as a Correctional Shift

Supervisor at the Medium Security Institution (MSI). Diggs had worked for the Division of Corrections for 28 years, 24 of those as a supervisor. On July 26, 2017, Diggs contacted Commissioner Dale Glass (Glass) with concerns about his pay being docked after having taken medical leave. At the time of the phone call, Diggs was sitting in the parking lot at MSI. Glass testified that during the course of their conversation, Diggs became angry and said to Glass, "what if I come and shoot up the place," referring to MSI. Glass testified that he was alarmed by Diggs' statement, both because Diggs had access to weapons at MSI as Shift Supervisor, and because Glass was ultimately responsible for the safety of the approximately 150 to 175 staff and 600 inmates at MSI. Glass ended the conversation and immediately called the police. Glass also contacted Superintendent Jeffrey Carson (Carson) and directed him to place Diggs on forced leave.

Carson contacted Major Tonya Harry (Harry) and told her to escort Diggs from the premises, where Diggs had by then reported to work. Harry found Diggs in the briefing room. As she escorted him out, she asked him what had happened. Diggs responded that he had had a conversation with Glass, and he had said "what if I blow up the place," to which Glass responded by asking if Diggs was making a threat. Harry testified Diggs told her that he was not making a threat, he was "just saying what if." Harry testified that Diggs was upset because he had filed complaints about being harassed by Carson and no one had addressed his complaints.

Glass created an incident report following the phone call, and he referred it to Superintendent Adrian Barnes (Barnes). Glass did so because Barnes was not involved in the phone call or in any of the complaints Diggs had filed. Barnes conducted a pre-termination review hearing of Diggs. Diggs was notified of the hearing, and he had an

2

opportunity to review the evidence against him prior to the hearing. Diggs attended the hearing with his attorney. Barnes took into account Glass' incident report as well as Diggs' prior work history and records of past disciplinary incidents, including two 15-day suspensions and two written reprimands. After the hearing, Barnes recommended termination of Diggs' employment.

Diggs appealed to the Commission, which upheld the termination of Diggs' employment based on a violation of the Department of Personnel Administrative Regulation 142 (Regulation 142), which prohibits City of St. Louis (City) employees from "using violence or threats of violence against any person in the workplace . . . ." The Commission made findings that Glass, Barnes, and Harry were credible witnesses "and worthy of belief." The Commission also found that Diggs' testimony "was not credible and was unworthy of belief." Diggs appealed the Commission's decision to the trial court, which affirmed. This appeal follows.

## Standard of Review

In an appeal following judicial review of an administrative agency's decision, we review the decision of the agency, not of the trial court. Mo. Coalition for Environment v. Herrmann, 142 S.W.3d 700, 701 (Mo. banc 2004). Our task is to make a "single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the [decision]." Albanna v. State Bd. of Registration for Healing Arts, 293 S.W.3d 423, 428 (Mo. banc 2009) (quoting Hampton v. Big Boy Steel Erection, 121 S.W.3d 220, 223 (Mo. banc 2003)). We defer to the Commission's findings of fact and credibility determinations, but we review questions of law *de novo*. George v. Civil Serv. Comm'n of City of St. Louis, 318 S.W.3d 266, 269 (Mo. App. E.D. 2010); see

3

also Turner v. Mo. Dep't of Conservation, 349 S.W.3d 434, 442 (Mo. App. S.D. 2011) (noting administrative regulations have same force and effect as statutes; court of appeals reviews constitutionality of regulations *de novo*).

Discussion

Diggs raises three points on appeal. First, he argues that the Commission's decision is not supported by competent and substantial evidence upon the whole record in that the evidence did not establish that Diggs made a true threat of violence. Second, Diggs argues that he did not receive due process in that he did not receive sufficient notice of, opportunity to review, or opportunity to defend against the evidence in support of the allegation that he had made threats of violence. Third, Diggs argues that Regulation 142 is unconstitutional both on its face and as applied to Diggs in that the regulation is overbroad, void for vagueness, and violates Diggs' equal protection under the law. We discuss each in turn.

Point I

In his first point on appeal, Diggs argues that the Commission's decision is unsupported by competent and substantial evidence on the whole record because the evidence the Commission relied upon did not establish that Diggs made a true threat of violence. We disagree.

Regulation 142 states, "City employees are prohibited from using violence or threats of violence against any person in the workplace, or outside of the workplace when the violence is work related." The regulation further defines violence:

> Violence under the City's policy shall include, but not be limited to: physically threatening or hostile behavior (belittling, abusing or bullying behaviors); bodily injury or harm; verbal threats of violence; physical assault; acts of vandalism, arson, or sabotage; and/or the unauthorized possession or use of a lethal weapon.

4

Regulation 142 thus clearly prohibits threats of violence. However, any prohibition on speech must be read in light of an individual's right to free speech under the First Amendment to the United States Constitution. United States v. Alvarez, 567 U.S. 709, 716 (2012) ("Statutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment").

While the First Amendment protects an individual's right to free speech, some restrictions on speech are permissible, one of which involves "true threats." Id. at 717 (citing Watts v. United States, 394 U.S. 705 (1969)). The most recent Supreme Court decision to define a "true threat" is Virginia v. Black, 538 U.S. 343 (2003). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. at 359. The Court added, "[t]he speaker need not actually intend to carry out the threat." Id. at 359-60. Restrictions on true threats are not aimed solely at preventing violence, but "protect[ing] individuals from the fear of violence and from the disruption that fear engenders," as well as "from the possibility that the threatened violence will occur." Id. at 360 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)) (internal quotations omitted). Thus, prohibitions on "true threats" will not run afoul of the First Amendment, and Regulation 142 may permissibly restrict any such threats.

Prior to Black, courts considered various factors in determining whether a threat was a "true threat" for purposes of the First Amendment, taking into account the context in which the maker of the threat communicates it. See Watts, 394 U.S. at 708 (finding political hyperbole, "taken in context," was not a "true threat"). These factors include "the reaction of the recipient . . ., whether the threat was conditional, whether the threat was

5

communicated directly to its victim, whether the maker of the threat had made similar statements to the victim in the past, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence." United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996) (citing cases) (internal citations omitted); see also Watts, 394 U.S. at 708) (noting "expressly conditional nature of the statement and the reaction of the listeners" in finding statement was not "true threat"). The Dinwiddie court further noted, "[t]his list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive." 76 F.3d at 925.

Here, there is competent and substantial evidence on the record to support the conclusion that Diggs made a "true threat." The Commission found that Diggs called Glass, and during the conversation, Diggs was upset and his voice was elevated. Diggs said to Glass, "what if I come and shoot up the place." Diggs was sitting outside MSI at the time of the phone call, which housed some 150 to 175 staff and 600 inmates. Glass was concerned that Diggs, as Shift Supervisor, would have access to weapons at MSI. Glass immediately contacted the police upon ending the conversation with Diggs. Glass also directed Carson to have Diggs, who had reported to work at that point, escorted out of the building.

Diggs argues that his words took the form of an information-seeking, open-ended question, and therefore was not a threat toward anyone in particular. We disagree. The issue is not the grammatical structure of the words, but their substance. Here, Diggs was sitting outside his workplace and suggested to his superior, with whom he already had grievances, that he would go inside and "shoot up the place." Posing it as a hypothetical does not make it less threatening. The fact that Diggs had not had previous violent

6

outbursts is not dispositive; the evidence was that he had been frustrated with his supervisors for failing to address his workplace concerns, and his frustration was mounting. Glass testified that he "did consider that there had been issues in the past when [Diggs] was upset about issues, he gets extremely upset." While Diggs points to the testimony of several coworkers that they would not have believed Diggs was serious if they heard him threaten to shoot up the place, none of them were present on the phone call with Glass, and they could not testify to his demeanor during the phone call or the context of that conversation. Further, as the Black Court noted, our determination centers on the statement, not the speaker's intent to carry it out. See 538 U.S. at 359-60.

The Commission's determination that Diggs violated Regulation 142 in that he made a threat of violence is supported by competent and substantial evidence on the whole record. Point denied.

Point II

Diggs argues that his dismissal from employment violated his right to due process in that he did not have sufficient notice, a fair hearing, opportunity to review the evidence against him, or opportunity to defend against such evidence. We disagree.

In the context of a pre-termination hearing for a public employee, due process entitles the employee to "oral or written notice of the charges against him [or her], an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). The Supreme Court noted that where a full post-termination hearing is available, "the pre-termination hearing need not definitively resolve the propriety of the discharge." Id. at 545. Rather, such a hearing "should be an initial check against mistaken decisions—essentially, a

7

determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46. The Eighth Circuit Court of Appeals has further explained that the procedure may be informal, and "an employer need not disclose all the details of the charges against the employee." Sutton v. Bailey, 702 F.3d 444, 448 (8th Cir. 2012) (quoting Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000)) (internal quotations omitted).

Here, Diggs argues that his pre-termination hearing was inadequate in that he was not aware of Harry's testimony prior to his termination.[1] However, he did receive notice that he would be terminated based on his statement to Glass, "what if I come shoot up the place." Diggs had an opportunity to review the evidence against him, which included Glass' report from the phone call and other pre-termination documents. He attended the pre-termination hearing with his attorney and had an opportunity to be heard at the hearing. The pre-termination hearing served its purpose as an initial check on the termination decision and whether there were reasonable grounds to believe that Diggs had violated Regulation 142. Point denied.[2]

---

[1] Diggs further argues that the Division of Corrections failed to follow its own Regulation 142, which requires that all witness statements be in writing and signed by the witness. Diggs points out there is no written witness statement signed by Harry, and contends that Barnes deliberately withheld Harry's statement until the hearing before the Commission. The City disputes that the Commission hearing was the first time Diggs learned of Harry's statement. Diggs argues that the City's failure to present him with Harry's statement in writing, in violation of Regulation 142, renders the Commission's decision arbitrary and capricious, citing Perry v. City of St. Louis Civil Serv. Comm'n, 924 S.W.2d 861, 865 (Mo. App. E.D. 1996) (Commission arbitrarily determined residency based on declared or "paper" residency over non-discredited evidence showing customary and regular physical presence elsewhere, in direct violation of rule regarding residency determination). We find this case distinguishable. The violation here was not related to the basis for termination, in that the Commission did not misapply the definition of violence in terminating Diggs. Moreover, Point II raises a due process argument. Due process does not require written witness statements in a pre-termination hearing, and we find the procedure here satisfied Loudermill's requirements.

[2] Diggs also includes an argument in Point II that the evidence showed the Division of Corrections does not administer discipline under Regulation 142 on a uniform basis, and that termination for Diggs' conduct was excessive here. Regulation 117 contains the Division of Corrections' disciplinary policy, and it includes the following provision: "Some offenses may be so severe that immediate . . . dismissal is warranted." The Division of Corrections determined this was such a case, and there was no evidence that any other employee

Diggs argues that Regulation 142 is unconstitutional on its face and as applied to Diggs, in that the regulation is overbroad, void for vagueness, and violates equal protection. We disagree.

First, regarding Diggs' argument that Regulation 142 is overbroad, the test for overbreadth is whether a statute prohibits both constitutionally protected conduct alongside conduct that is not protected by the Constitution. State v. Beine, 162 S.W.3d 483, 486 (Mo. banc 2005). The overbreadth doctrine is unique in that it permits a challenge by a person whose speech was not necessarily protected to raise a claim that the statute "threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985). A facial challenge to a statute will be successful only where the overbreadth is "substantial." Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (quoting Houston v. Hill, 482 U.S. 451, 458-59 (1987)). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Id. (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984)).

Here, Regulation 142 prohibits "violence or threats of violence" and further defines violence as such:

> Violence under the City's policy shall include, but not be limited
> to: physically threatening or hostile behavior (belittling, abusing

---

had made similar threats on other occasions. We see no violation of Diggs' procedural due process rights on this basis.

9

> or bullying behaviors); bodily injury or harm; verbal threats of violence; physical assault; acts of vandalism, arson, or sabotage; and/or the unauthorized possession or use of a lethal weapon.

Diggs argues that the phrase, "including, but not limited to" necessarily renders the regulation overbroad because it prohibits more than "true threats" of violence. Diggs argues speech with "violent overtones" could be subject to discipline under the regulation, or even a present admission by an employee that he or she desired to harm a coworker several years ago.

However, this Court has previously highlighted the distinction between criminal statutes and administrative rules applicable to public employees as it relates to the First Amendment. See Medvik v. Ollendorff, 772 S.W.2d 696, 701-02 (Mo. App. E.D. 1989). "[A]s an employer, a government entity may regulate speech among its employees under rules that may be overbroad if applied to the public in general." Id. at 702. Here, the Division of Corrections has an interest in maintaining its facilities free of violence or threats of violence. Regulation 142 prohibits such speech and actions, and a sensible construction will differentiate true threats of violence from the hypothetical situations Diggs raises. See id. at 701-02 (regulation at issue, sensibly read, did not seek to deter harmless jokes, but well-known pejoratives unacceptable in the workplace). Regulation 142 does not threaten to chill constitutionally protected speech for fear of prosecution, but rather protects employees from violent behaviors and threats that would place them in fear of harm. While it may "[c]onceivably . . . be susceptible to an improper application[,]" we can also see "a substantial number of situations to which the . . . regulation might validly apply[.]" Id. at 702 (quoting Ferguson Police Officers Ass'n v. City of Ferguson, 670 S.W.2d 921, 929 (Mo. App. E.D. 1984) ("If the rights of persons on the edge of the

10

regulation's applicability will be infringed, it will be for them to make the challenge in a concrete dispute")). As such, the regulation is not "substantially overbroad." See id.

Second, Diggs argues Regulation 142 is void for vagueness, focusing again on the regulation's phrase, "including, but not limited to . . . ." A regulation is void for vagueness if it fails to clearly provide notice of prohibited conduct, such that "[people] of common intelligence must necessarily guess at its meaning." State v. Stokely, 842 S.W.2d 77, 80-81 (Mo. banc 1992) (quoting State v. Young, 695 S.W.2d 882, 884 (Mo. banc 1985)). Additionally, "[t]here must be sufficient guidance provided by the [regulation] so as to avoid arbitrary and discriminatory applications." Id. at 81.

We do not agree that Regulation 142 is void for vagueness. As noted above, a sensible construction of the regulation makes clear the prohibited conduct relates to actual or threatened violence. In Medvik, this Court similarly determined the administrative rule at issue was not void for vagueness, noting there that "[a] rule designed to prevent inflammatory and disruptive statements . . . necessarily involves some inherent uncertainty." 772 S.W.2d at 701. The same is true for a rule designed to prevent threats of violence. The City cannot list every conceivable type of violence or threat that would fall under this policy, but we find persons of normal intelligence are capable of determining what threats would be considered true threats of violence under the regulation. See id. (persons of normal intelligence are capable of determining whether racial remark is "unwanted" or "imprudent"; due process does not require City to define such terms with "mathematical precision").

Finally, Diggs argues that Regulation 142 violates his right to equal protection under the law, in that the regulation prohibits "verbal" threats of violence, but not written

11

threats of violence. However, "verbal" is defined as "of or relating to words." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2542 (1976). A written threat would qualify as a "verbal" threat under Regulation 142. Thus, we need not further consider this claim.[3] Point denied.

### Conclusion

The Commission's finding that Diggs' statement, "what if I come and shoot up the place," was a violation of Regulation 142, is supported by competent and substantial evidence on the whole record. The Commission's decision does not violate Diggs' First Amendment right to free speech because the evidence supports the conclusion that Diggs' statement was a "true threat," which is subject to permissible restriction. Additionally, the City's pre-termination procedure provided adequate due process to Diggs. Regulation 142 is not overbroad or void for vagueness, and it does not violate equal protection in that it prohibits both spoken and written threats of violence. We affirm the decision of the Commission.

_____
Gary M. Gaertner, Jr., P. J.

Philip M. Hess, J. and Michael E. Gardner, J. concur.

---

[3] Diggs' additional reasoning for his equal protection claim hinges on his assertion that Regulation 142 prohibits statements beyond "true threats." As we have discussed, *supra*, we disagree.